No. 80-244

IN THE SUPREME COURT OF THE STATE OF MONTANA

1981

TOM D. LITTLE et al.,

Plaintiff and Respondent,

vs.

THE BOARD OF COUNTY COMMISSIONERS
OF FLATHEAD COUNTY, et al.,

Defendants and Appellants.

Appeal from:  District Court of the Eleventh Judicial District,
In and for the County of Flathead.
Honorable Robert M. Holter, Judge presiding.

Counsel of Record:

For Appellants:

Ted Lympus, County Attorney, Kalispell, Montana
Jonathan B. Smith, Deputy County Attorney, argued,
Kalispell, Montana
Murphy, Robinson, Heckathorn and Phillips, Kalispell,
Montana
Daniel D. Johns argued, Kalispell, Montana
Eileen Shore, Pub. Ser. Comm'n, Helena, Montana

For Respondent:

Norbert Donahue, City Attorney, argued, Kalispell, Montana
Keller and Gilmer, Kalispell, Montana
Robert S. Keller argued, Kalispell, Montana
Murray, Kaufman, Vidal and Gordon, Kalispell, Montana

Submitted:  January 14, 1981

Decided:  JUL 21 1981

Filed:  JUL 21 1981

Thomas J. Kearney
_____
                          Clerk

Mr. Justice Daniel J. Shea delivered the Opinion of the Court.

Flathead County Commissioners, the defendants, appeal from a Flathead County District Court order enjoining them from proceeding further with their resolution of intent to zone Cameron Tract (a 59-acre tract) for commercial use so that a shopping center could be built on the land. The developers, Developers Diversified, Ltd., defendants by their own intervention, appeal from that part of the District Court order which stopped the defendant City of Kalispell from issuing a building permit which would allow the construction to begin. Plaintiffs are landowners adjacent to the Cameron Tract who oppose the plans to construct the shopping center. They started this litigation by asking the trial court to enjoin the County from rezoning the land from residential to commercial and to enjoin the City of Kalispell from issuing a building permit to the Developers.

In granting the injunction, the trial court ruled that the county commissioners had violated the law in several ways. First, it held that the commissioners adopted an illegal resolution (Resolution 291) by which they could zone land only if 50 percent of the landowners in an area petitioned to have their land given a certain zoning classification. The court held that this resolution was "the most flagrant invitation to spot zoning that one could come across." As applied to this case, the court held that illegal spot zoning would result if the commissioners zoned the land as commercial, because that would fly in the face of the master plan's recommendation that the Cameron Tract be zoned as medium-density residential. Second, the court ruled that the comprehensive plan (the master plan) must be followed, and that commercial use of the Cameron Tract could

-2-

be effectuated only by amending the master plan with the approval of both the City of Kalispell and Flathead County. Third, the court ruled that the City of Kalispell could not issue a building permit to the Developers because the zoning would not be in compliance with the law. The court did not give any reasons for prohibiting the issuance of the building permit, but we assume that the decision was based on the conclusion that a building permit for a commercial use could not be issued where the master plan recommended a residential use.

The County raises three issues but fails to address the rulings of the trial court. First, without discussing the legality of the action taken by the county commissioners, the County argues that the commissioners were engaged in the legislative process and that until a final decision had been reached (either granting or denying the zoning request) the trial court had no right to intervene by granting injunctive relief to the plaintiffs. The County argues that the plaintiffs were not irreparably harmed by the commissioners' threatened action and therefore there was no reason to invoke the exception that a court may intervene with the legislative process where irreparable harm will result. Second, the County argues that the trial court erred in ruling that the County should have followed the comprehensive plan (master plan). (The County does not suggest, however, what status this plan should have, other than arguing that the plan is merely a guide in zoning decisions.) Third, the County argues that in holding that the county commissioners did not adhere to and give proper consideration to the comprehensive plan (master plan), the trial court improperly substituted its judgment for that of the county commissioners.

-3-

The Developers, though technically not appealing the ruling enjoining the county commissioners from proceeding with their zoning request, do argue that the trial court had no right to enjoin the commissioners from that activity. The Developers, however, primarily attack the ruling which enjoined the City of Kalispell from issuing a building permit to the Developers.

On the building permit issue, the Developers first challenge the right of the plaintiffs to contest the issuance of the building permit. They contend the plaintiffs did not show they would be irreparably harmed by the issuance of the permit, and therefore the question should be solely a matter between the Developers and the City. Second, the Developers argue that even if the plaintiffs have the right to challenge the issuance of the permit, the issuance of the permit could not be refused on the ground that the proposed use would not be in accordance with the comprehensive plan (master plan). This second argument assumes that unzoned land can be used for any purpose not specifically prohibited.

The City's position on appeal is contrary to its position at trial. Plaintiffs named the City as a defendant because the City has jurisdiction over the issuance of building permits. Although the City did not challenge the plaintiffs' standing to contest the issuance of the permit, the City nonetheless argued that it had a duty to continue processing the building permit application because Cameron Tract was unzoned and therefore not in violation of any zoning laws. Before the trial court decided the case, however, the City switched positions and claimed that it could refuse to process the building permit application once it determined that the use proposed by the Developers violated the use specified in the comprehensive plan (master plan), even

-4-

though the land was unzoned. The City takes that same position before this Court.

For reasons which we will explain later, we affirm the trial court's decision. We will first set out the factual background of this lawsuit together with the intermeshing legal background of planning and zoning.

BACKGROUND OF THE LAWSUIT

The land involved, Cameron Tract, is on the north end of the City of Kalispell and is surrounded on three sides by the boundaries of the City. The City has never annexed the tract, and, as we shall later explain, the City cannot legally do so, nor has this land ever been zoned. In 1974, the City of Kalispell adopted a master plan for this area, which recommends that this tract be zoned medium-density residential. In 1978, a joint City of Kalispell-Flathead County Master Plan was adopted for this same area, and it also recommends that the land be zoned medium-density residential. In fact, the 1978 master plan simply adopts the 1974 master plan.

The City has proceeded to zone most of the City of Kalispell pursuant to its own 1974 master plan. The land surrounding Cameron Tract has been zoned residential.

In December 1975, Flathead County adopted a detailed set of zoning regulations that applied to that part of the County in the Kalispell-City County Planning Board jurisdictional area. That action by the County prevents the City of Kalispell from promulgating and enforcing its own zoning ordinances anywhere outside the city limits. (See, section 76-2-310(1), MCA.) If the County had not done this, the City would have had certain limited rights to promulgate and enforce its own zoning ordinances outside its actual city boundaries (section

-5-

76-2-311, MCA). The important point here is that the City has applied its zoning ordinances to all city property, but Flathead County has not applied its zoning ordinances to all county property.

In 1978, Flathead County adopted a comprehensive development plan for the entire county, and this included the 1974 master plan adopted by the City to cover the area which it had a right to plan. (The parties have not stated whether this 1978 comprehensive development plan is a "master plan" or some other planning device.) In any event, in adopting this comprehensive plan in 1978 by Resolution 291, the commissioners also adopted in the same resolution an official policy of zoning property only upon specific petition of the owners who wanted a particular zoning classification. This policy has had a dual effect. First, the majority of the County property in the area remains unzoned. Second, even where it is zoned within the Kalispell-City County Planning Board jurisdictional area, the zoning is very haphazard and extremely selective. The trial court best characterized the inevitable result of such a policy by stating that Resolution 291 "is the most flagrant invitation to spot zoning that one could come across . . ."

For these reasons, Cameron Tract, although within the Kalispell-City County Planning Board jurisdictional area, and designated as residential by the 1974 master plan, has not been zoned and therefore remains in a twilight zone. The Developers stepped into this twilight zone with their plans for a regional enclosed shopping center. Recognizing the policy of the county commissioners inherent in Resolution 291, the Developers acquired a sufficient interest in Cameron Tract , and petitioned the county commissioners to zone the land as commercial.

-6-

Because Cameron Tract is unzoned, the Developers assumed that there were no use restrictions preventing the construction of a shopping center on the land. But they were faced with the obstacle of getting water and sewage services for the shopping center. That problem indirectly raised the problem of zoning. Although Cameron Tract is within the County, the county commissioners adopted a policy requiring that city water and sewage services be used if they are "reasonably available." So, the Developers first had to determine if these services were "reasonably available."

City water and sewer lines ran under Cameron Tract. The Developers asked the City for hook-ups to its water and sewer lines, but City ordinances and state statutes stood in the way. The ordinances make City services available only after annexation of the property into the City. The ordinances also state that any annexation and zoning classification within the City must be consistent with the City-County Comprehensive Plan (the master plan). This plan recommended that Cameron Tract be classified as medium-density residential. This meant that before a shopping center could be built on Cameron Tract, the master plan would first have to be amended.

The Developers asked for an amendment to accomodate the shopping center, but on October 1, 1979, the City-County Planning Board, voted five to three to keep the plan as it was. As a result, the Developers could not get water and sewer services from the City. This meant that the Developers could apply to the County to provide the water and sewage services. The county commissioners cooperated and granted the Developers an on-site water and sewage disposal permit.

-7-

The Developers have always proceeded on the assumption that they could build the shopping center--or anything else--on Cameron Tract because it was unzoned. Nonetheless, they petitioned the county commissioners to either amend the master plan to permit a commercial classification or to zone Cameron Tract as commercial. The Developers also submitted their building plans and applied to the City for a building permit for the proposed shopping center. By statute, the City is given certain extraterritorial jurisdiction to process building permits and enforce building code regulations. See, section 50-60-106, MCA.

The mandatory procedure for the creation of zoning districts or promulgation of applicable zoning regulations, is set out in section 76-2-205, MCA, and it includes public notice and a hearing. Notice was given and a hearing was held. City of Kalispell officials appeared and recommended against the zoning application because the master plan for the area designated the land as residential rather than commercial.

On December 7, 1979, three days after the public hearing, the county commissioners adopted a resolution of intent to zone Cameron Tract as commercial. In doing so, however, they failed to take a mandatory step. Before a zoning district can be created, section 76-2-204, MCA, requires that "the board of county commissioners shall require the county planning board and the city-county planning board to recommend boundaries and appropriate regulations for the various zoning districts." In addition, the statute requires the county and the city-county planning board to make written reports of their recommendations to the board of county commissioners, but also provides that such recommendations are

-8-

"advisory only."

The commissioners neither demanded, requested, nor received written recommendations from the City-County planning board before they adopted the resolution of intent. Without these recommendations, the county commissioners had no right to proceed with its resolution of intent to zone Cameron Tract as commercial. The applicable statutes clearly mandate that the planning board's recommendations be considered before the commissioners can proceed with a resolution of intent. Section 76-2-205(3) states:

> "After the public hearing, the board of county commissioners <u>shall</u> <u>review</u> the proposals of the planning board and shall make such revisions or amendments as it may deem proper." (Emphasis added.)

This step in subsection (3) must be taken before the commissioners can proceed to subsection (4) which gives the commissioners the power to adopt the resolution of intent.

Although the plaintiffs did not rely at trial on the County's failure to involve the planning board, it is nonetheless clear on the face of the record that the Commissioners' action was invalid.

Once a resolution of intent to zone is passed, sections 76-2-205(5) and (6), MCA, also prescribe mandatory steps to be taken before a zoning district can be created or regulations promulgated. Subsection (5) provides for the method of giving public notice and sets out the contents of such notice. The commissioners complied with this subsection. There is also a 30-day period in which the proposed action can be protested, and, at the end of that period, the commissioners can either create the zoning district and promulgate applicable regulations, or they can decide against the resolution.

However, only those within the proposed zoning area can contest the proposed action. Section 76-2-205(6), MCA. If 40 percent of the landowners within the affected area protest, the resolution cannot be adopted and the commissioners cannot again take action on another zoning resolution for that area for at least one year. Because the Developers owned the entire tract on which the commercial zoning was requested, no one could protest. The plaintiffs, all of whom own land adjacent to Cameron Tract, had no statutory basis to contest the commissioners' proposed action to zone Cameron Tract as commercial.

The plaintiffs were also faced with another immediate official decision affecting Cameron Tract. While the county commissioners were processing the Developers' zoning request, the Developers had also applied to the City of Kalispell for a building permit, and the issuance of this permit was imminent, although not legal, as we shall later explain.

The building code requires that the appropriate officials determine if the building site (Cameron Tract here) is in compliance with "applicable laws . . ." and "other pertinent laws and ordinances . . ." (Kalispell City Ordinance, Uniform Building Code, § 303(a).) Because Cameron Tract was unzoned, city officials had assumed there were no use restrictions, thus they were in the later stages of processing the building permit application and checking for technical compliance with the building codes.

In anticipation of receiving the building permit, the Developers moved heavy machinery onto Cameron Tract to grade the land in preparation for the start of construction. There is some evidence that the Developers had also started groundbreaking.

This was the situation when the plaintiffs filed a lawsuit asking the District Court to enjoin the commissioners from zoning Cameron Tract as commercial, and asking the court to enjoin the City of Kalispell from issuing the building permit. Additional plaintiffs later joined the lawsuit and asked for the same relief against the County and the City.

The plaintiffs obtained first a temporary restraining order, later a temporary injunction, and, after a hearing on the merits, a final order and injunction stopping the county commissioners from zoning Cameron Tract as commercial, and stopping the City of Kalispell from issuing the building permit to the developers.

THE QUESTION OF WHETHER THE TRIAL COURT PROPERLY INTERFERRED WITH A CONTINUING LEGISLATIVE PROCESS

In preventing the county commissioners from adopting their resolution of intent, the County claims that the trial court violated the long-standing rule that a court will wait for the completion of the legislative process before acting to enjoin enforcement of the legislation. Although the County recognizes an exception to this rule--that a court may enjoin enforcement of the proposed legislation where the threatened harm will be irreparable and where there is no adequate remedy--the County argues that this exception does not apply here. We have no quarrel with this abstract statement of the law, but it has no application here. The plaintiffs were challenging not only the result that the commissioners intended--they were also contesting the procedures used in reaching that result.

The County fails to acknowledge the Catch-22 bind in which the plaintiffs had been placed. The plaintiffs were faced not only with the obvious attempt by the county commissioners

-11-

to zone Cameron Tract as commercial. They were also faced with an imminent decision by the City to issue a building permit to the Developers. If the plaintiffs had waited any longer, they would have taken the chance that the building permit would be issued, and that construction would begin. The Developers would then undoubtedly have argued that it would be inequitable to deny them the right to build a shopping center after they had already in the beginning stages of construction, spent so much money. These were the realities when the plaintiffs filed their lawsuits.

This situation was a sufficient basis for the trial court to grant a restraining order preserving the status quo.

The County dignifies form over substance by arguing that the county commissioners were engaged in the legislative process when acting on the Developers' request to zone Cameron Tract as commercial. The commissioners were not involved in adopting a general policy of zoning for the area. Rather, they were involved in selecting a specific tract of land for a special zoning consideration for a particular owner. This activity is more of a quasi-judicial decision-making process than a legislative-zoning process. The commissioners have no power to engage in such a process. See, South of Sunnyside, Etc. v. Bd. of Commissioners, Etc. (1977), 280 Or. 3, 569 P.2d 1063. The quasi-judicial power under the zoning laws applicable to counties is reserved to the County Board of Adjustment (sections 76-2-221 through 76-2-228, MCA). However, even the Board of Adjustment could/have granted
                                                                    not
the relief required here. The Board of Adjustment can act only in relation to zoning regulations already in effect for an area, but here the area had not yet been zoned.

The failure of the county commissioners to implement the comprehensive plan (master plan) by creating zoning districts and promulgating applicable zoning regulations, brings us to the issue of spot zoning. Neither the County nor the Developers have discussed this issue in their briefs, even though the trial court specifically held that the policy inherent in Resolution 291 leads to the worst kind of spot zoning.

THE SPOT ZONING ISSUE

By any definition, this case involves spot zoning of the worst kind. The commissioners were about to zone as commercial a 59-acre tract of land solely to accommodate the Developers, who wanted to build a regional shopping center. The land is surrounded on three sides by City of Kalispell boundaries, and this entire area is, by the trial court's findings, 99 percent residential. Further, the comprehensive plan in effect for this area recommends that the land involved be used for residential purposes. Zoning as was about to take place here is the very opposite of planned zoning.

In a memorandum accompanying its findings and conclusions, the trial court aptly characterized the effect of the county commissioners' policy:

> "This case arose because of the policy of the County Commissioners of Flathead County not zoning a tract of land until the owners of that tract petitioned the Commissioners to do so. (Resolution 291) . . . The type of zoning here has been condemned as piece-meal zoning and should be struck down . . . the action of the County Commissioners (or should we say inaction) is the most flagrant invitation to spot zoning that one could come across. Without regard to any effort put into the comprehensive plan, the commissioners simply refused to consider any zoning except upon application."

-13-

Due to the failure of the County and the Developers to address this issue, we can only assume that they concede this to constitute spot zoning, but that somehow it should be overlooked.

There is no single, comprehensive definition of spot zoning applicable to all fact situations. Generally, however, three factors enter into determining whether spot zoning exists in any given instance. First, in spot zoning, the requested use is significantly different from the prevailing use in the area. Second, the area in which the requested use is to apply is rather small. This test, however, is concerned more with the number of separate landowners benefited by the requested change than it is with the actual size of the area benefited. Third, the requested change is more in the nature of special legislation. In other words, it is designed to benefit only one or a few landowners at the expense of the surrounding landowners or the general public. See, Williams, 1 American Land Planning Law, at 563; Hagman, Urban Planning and Land Development Control Law (1971), at 169; Rhyne, The Law of Local Government Operations (1980), at 760-761.

> In explaining the third test, Hagman gives this qualification:
>
> "The list is not meant to suggest that the three tests are mutually exclusive. If spot zoning is invalid, usually all three elements are present or, said another way, the three statements may merely be nuances of one another."
> Hagman at 169.

This qualification must be heeded because any definition of spot zoning must be flexible enough to cover the constantly changing circumstances under which the test may be applied.

For example, in Rodgers v. Village of Tarrytown (1951), 302 N.Y. 115, 96 N.E.2d 731, the New York Court of Appeals, in holding that the practices involved constituted spot

zoning, stated that spot zoning is the process of singling out "a small parcel of land" for a use classification totally different from that of the surrounding area, for the benefit of the owner of such property and to the detriment of other owners. But in Thomas v. Town of Bedford (1961), 222 N.Y.S.2d 1021, aff'd. (1962), 11 N.Y.2d 428, 230 N.Y.S.2d 684, 184 N.E.2d 285, the argument was that the practices involved did not constitute spot zoning because the tract of land involved was not small--it was 123 acres. The court then held that the reference in Rodgers to "a small parcel of land" was inappropriate. Rather, it is really a question of preferential treatment for one or two persons as against the general public, regardless of the size of the tract involved.

Undoubtedly, the county commissioners were engaged in spot zoning here. First, the requested use of Cameron Tract for the commercial development of a regional shopping center is significantly different from the prevailing residential use in the surrounding area. The land is surrounded on three sides by the City boundaries, and this entire area is, by the trial court's findings, almost 99 percent residential. Further, the master plan in effect for this area recommends that the land be used for residential purposes. Zoning such as was about to take place here is the very opposite of planned zoning.

Under the third test for spot zoning, Hagman, supra, states that the inquiry should involve whether the requested use "is in accord with a comprehensive plan." (Emphasis added.) Although the cases cannot be harmonized completely because of the differences in statutes, zoning has been held invalid as spot zoning when it is not in accordance with a

comprehensive plan. See, for example, Hines v. Pinchback-Halloran Volkswagen, Inc. (Ky. 1974), 513 S.W.2d 492; Fasano v. Bd. of County Commrs. (1973), 264 Or. 574, 507 P.2d 23; Jablon v. Town Planning & Zoning Comm'n. (1969), 157 Conn. 434, 254 A.2d 914. We cannot ignore this test when our zoning statutes place great weight on the comprehensive plan as a guide in zoning. For example, section 76-2-203, supra, specifically states that zoning shall be conducted "in accordance with a comprehensive development plan." Applied here, a commercial regional shopping center can hardly be said to fit into a medium-density residential area recommended by the master plan.

The second test concerns the size of the area for the requested use. Although most often the size of the area is rather small, that is not always the case, as demonstrated by Rodgers v. Village of Tarrytown, supra. An important inquiry under this test is how many separate landowners will benefit from the zone classification. See, Spot Zoning and the Comprehensive Plan (Spring 1959), 10 Syracuse L.Rev. 303, at 306. Also, as we have already noted, size may not be the vital factor if the real issue is a question of preferential treatment for one or a few persons as against the general public. Thomas v. Town of Bedford, supra. Here, the area is not small (59 acres), but it does involve the owners of Cameron Tract receiving preferential treatment so that they can build a shopping center in an area designated for residential use in the master plan.

The objective of the requested zone classification was clearly to give a special advantage to the Developers. By promulgating Resolution 291, the county commissioners announced to the general public that they were in the business of

granting special zoning classifications to owners if at least 50 percent of them in an area asked for a particular classification. The Developers, who owned all of Cameron Tract, seized on this resolution, to secure special privileges for themselves, but it was to the detriment of the plaintiffs who did not want a regional shopping area in the midst of their residential area.

Based on these factors, we hold that the county commissioners were engaged in a pernicious system of spot zoning devoid of any redeeming qualities.

## THE ROLE OF THE COMPREHENSIVE PLAN (MASTER PLAN) IN THE CREATION OF ZONING DISTRICTS

The question inevitably arises as to how closely the comprehensive plan must be followed. The trial court ruled that the county commissioners failed to follow the comprehensive plan (master plan) and that the zoning of Cameron Tract could not take place without first amending this plan. There remains the question of how closely the plan must be followed when creating zoning districts and promulgating zoning regulations.

The County argues that the comprehensive plan (master plan) is advisory only, and that the governing body having the authority to zone under the plan, is free to give it whatever weight it wants. In support of its argument, the County has marshalled the statutes which set out the role of the planning boards both before and after adoption of the comprehensive plan (master plan). Because the planning boards serve in an advisory capacity to the local governing bodies, the County assumes that the comprehensive plan (master plan) has that same advisory status. This logic is not supported by the statutes.

-17-

The City, on the other hand, argues that although the comprehensive plan need not be religiously followed in every detail, substantial compliance is required. The City suggests that to zone Cameron Tract for commercial use would first require an amendment to the comprehensive plan, approved by the governing bodies of the City and County. It appears that the plaintiffs argue that there must be at least substantial compliance with the comprehensive plan (master plan) also.

The statutory scheme contemplates that once a "master plan" is adopted by a governing body, any later references in the statutes to the terms "comprehensive plan" or "comprehensive development plan" are synonymous to the term "master plan." In Title 76, Ch. 1 (Planning Boards), a definitional statute, section 76-1-103(4), MCA, explains the terms:

> "'Master plan' means a comprehensive development plan or any of its parts such as a plan of land use and zoning, of thoroughfares, of sanitation, of recreation, and of other related matters."

Applied here, the "master plan" adopted by the county commissioners, is within the meaning of section 76-1-103(4), a "comprehensive development plan."

The question then becomes one of how closely the governing body must follow the "comprehensive development plan" (master plan) when creating zoning districts and when promulgating zoning regulations. Section 76-1-605, MCA, particularly deals with how an adopted master plan shall be used in making zoning decisions:

> "After adoption of the master plan, the city council, the board of county commissioners, or other governing body within the territorial jurisdiction of the board shall be guided by and give consideration to the general policy and pattern of development set out in the

-18-

master plan in the . . . (4) adoption of zoning
ordinances or resolutions." (Emphasis added.)

This statute unequivocally tells local governing bodies
that once a master plan is adopted, it must be used for
their guidance in zoning. Further the zoning statutes
covering county zoning, Title 76, Ch. 2, sections 76-2-101
through 76-2-112, MCA, undeniably lead to the conclusion that
the master plan is of paramount importance. In fact, the
unmistakable message of these statutes is that if no comprehensive
plan (master plan) has been adopted (section 76-2-201, MCA),
and if no jurisdictional area has been created after the
adoption of the master plan (section 76-2-202, MCA), the
counties are without authority to zone except on an interim
basis.

The objective under these statutes is that there be the
final adoption of a master plan, and then that the master
plan be followed once it has been adopted. The planning and
organization statutes (sections 76-1-101 through 76-2-112,
MCA) set out a step-by-step basis by which a master plan is
to be derived. The term "comprehensive development plan"
contained in section 76-2-201, refers back to these organization
and planning statutes. As we have already mentioned, without
a master plan in effect and without a jurisdictional area
carved out after the adoption of the master plan, the counties
have no authority to institute permanent zoning classifications.
Rather, their only authority to zone is on a temporary
interim emergency basis as set out in section 76-2-206, MCA.

Even the temporary emergency zoning statute seems
designed to encourage the adoption of a master plan, for it
sets out only two conditions under which emergency zoning
can be adopted, and further states that temporary emergency
zoning can be adopted for no more than a two-year period.

-19-

Section 76-2-206(1) states that temporary emergency zoning may be used only when the governing body has not yet completed the planning stages of a comprehensive plan (Title 76, Ch. 1) or when the governing body has not yet implemented the zoning regulations after a zoning district has been established. Subsection (2) of this statute strictly limits to two years the time within which the temporary emergency zoning may remain in effect.

Without regard to how closely the comprehensive plan (master plan) must be followed, these statutes leave no doubt that great reliance is placed on the comprehensive plan (master plan) as a guide in zoning.

Because a master plan was in existence and the county commissioners had carved out a jurisdictional area, the county commissioners had the authority to permanently zone the area which includes Cameron Tract. Section 76-2-202, MCA, states in part that "the board of county commissioners may by resolution establish zoning districts and zoning regulations for all or part of the jurisdictional area." But the commissioners did nothing after this point. Rather, they had adopted the policy (Resolution 291) of not zoning at all unless the property owners in the area involved asked for a particular zoning classification. That policy surfaced in this case when the commissioners were about to accommodate the wishes of the Developers by zoning Cameron Tract (59 acres) for commercial use, although the master plan recommended that the area be zoned for medium-density residential use.

The county zoning statutes (sections 76-2-201 through 76-2-228, MCA) rely heavily on the master plan and on the role of the planning board in providing maximum input to the county commissioners on the question of planning and zoning.

-20-

Before the county commissioners can create a zoning district or promulgate zoning regulations for the district, section 76-2-204, MCA, requires the county commissioners to direct the planning board to "recommend boundaries and appropriate regulations for the various zoning districts." This statute further requires the planning board to make "written reports of their recommendations to the board of county commissioners. . . ." Even though the statute also provides that the planning board's recommendations "shall be advisory only," this is because the final zoning authority is given to the county commissioners rather than to the planning boards. The intent of these statutes is to require maximum input from the planning boards to the county commissioners before the commissioners reach a zoning decision. This is simply a recognition that the planning board is in continuing and closer touch with the comprehensive plan (master plan) than are the county commissioners.

The master plan would have little meaning unless the planning board had a significant and continuing role in the processes which finally lead to a decision by the county commissioners. The significance of the planning board's role can be better understood in light of the statutory criteria that must be followed in all zoning decisions. Section 76-2-203, MCA, sets out the general objectives of county zoning, and the criteria that must be considered. Virtually the same language is contained in the city zoning statute, section 76-2-304, MCA, which we interpreted in Lowe v. City of Missoula (1974), 165 Mont. 38, 525 P.2d 551.

The first phrase of section 76-2-203 sets the tone for all that comes after it. It states that "the zoning regulations shall be made in accordance with a comprehensive

-21-

development plan . . ." (Emphasis added.) We assume here that the term "zoning regulations" is also meant to cover the term "zoning districts." We cannot ignore the mandatory language ("shall") of this statute.

We again emphasize that the continuing role of the planning board in the zoning process is set out in the statute (section 76-2-205, MCA) providing that mandatory steps be taken in the creation of zoning districts and in the promulgation of zoning regulations. After public notice has been given and public hearing held pursuant to subsections (1) and (2), subsection (3) requires that "after the public hearing, the board of /commissioners shall review the proposals of the planning board and shall make such revisions or amendments as it may deem proper." The commissioners must do this before they can take the next step provided in subsection (4), that of adopting a resolution of intent to create a zoning district or to promulgate zoning regulations. This statutory scheme requires the county commissioners to obtain maximum input from the planning board, even though the final decision is left to the governing body--the county commissioners.

The vital role given the planning boards by these statutes cannot be undercut by giving the governing body the freedom to ignore the product of these boards--the master plan. We hold that the governmental unit, when zoning, must substantially adhere to the master plan.

ADHERENCE TO THE MASTER PLAN WHEN ZONING

To require strict compliance with the master plan would result in a master plan so unworkable that it would have to be constantly changed to comply with the realities. The

-22-

master plan is, after all, a plan. On the other hand, to require no compliance at all would defeat the whole idea of planning. Why have a plan if the local governmental units are free to ignore it at any time? The statutes are clear enough to send the message that in reaching zoning decisions, the local governmental unit should at least substantially comply with the comprehensive plan (or master plan). This standard is flexible enough so that the master plan would not have to be undergoing constant change. Yet, this standard is sufficiently definite so that those charged with adhering to it will know when there is an acceptable deviation, and when there is an unacceptable deviation from the master plan.

As we have explained, the statutes require a reading that the legislature intended the master plan to have substance. If a master plan must be in existence before the county commissioners can permanently zone, and if the right to adopt emergency interim zoning is limited to two years, it makes little sense to then permit the local governing body to ignore the master plan once it has been created. If the master plan is important enough to be a condition precedent to permanent zoning, it is also important enough to be followed once it is in existence. For these reasons, we hold that only substantial compliance is mandated by the statutes.

We are aware that changes in the master plan may well be dictated by changed circumstances occurring after the adoption of the plan. If this is so, the correct procedure is to amend the master plan rather than to erode the master plan by simply refusing to adhere to its guidelines. If the local governing bodies cannot cooperate to this end, the

only alternative is to ask the legislature to change the statutes governing planning and zoning.

THE DEVELOPERS' APPEAL--THE BUILDING PERMIT

As mentioned, the Developers, although disagreeing with the trial court's decision enjoining the county commissioners from zoning Cameron Tract for commercial use, concentrate on the argument that the court had no right to enjoin the City of Kalispell from issuing the building permit. They argue that the plaintiffs had no standing to challenge the issuance of the building permit, and further, assuming that the plaintiffs had such standing, they argue that the laws governing issuance of building permits do not stand in the way of obtaining a permit to build on land that has not been zoned. In effect, the Developers contend they have a right to a building permit, and therefore to build, regardless of any decision enjoining the county commissioners from zoning the land as commercial.

As set out in detail before, the situation facing the trial court was that if an injunction was not issued against the City of Kalispell enjoining it from issuing the building permit pending resolution of the lawsuit, construction might have started despite the filing of the lawsuit. So, even if the trial court later ruled that the county commissioners had no right to zone Cameron Tract as commercial, the Developers would nonetheless ask the trial court to dismiss the plaintiffs' lawsuit because the Developers had already spent large sums of money in the preliminary stages of construction. We have no doubt, therefore, that the trial court was correct in enjoining the issuance of the building permit until all the legal questions were resolved. Stopping the City of Kalispell from issuing the building permit until all legal issues were decided was the only way of preserving the status quo.

-24-

Based on these factors, the Developers are in no position to avail themselves of a technical argument that the plaintiffs did not prove special damage to them if the building permit were to issue and construction to begin. Further, plaintiffs presented evidence that demonstrates they would be more adversely affected by the regional shopping center than would the general public. Although there were other factors involved, we are convinced that the increased traffic alone was sufficient to show that plaintiffs, as adjacent owners, would be injured in a manner that the general public would not.

According to the Developers' own studies, the shopping mall would attract 13,000 cars per day. These studies also showed, and the trial court found, that the side streets near the shopping center, which presently bear 3,000 cars per day, would have to bear 13,000 cars per day if the shopping center were built. The studies were completed by the State Department of Highways and Stahly Engineering, at the specific request of the Developers. The Developers now attack these studies, saying that they are mere speculation. The studies were probative on the question of whether the Developers would proceed with building a shopping center and they should be equally probative and available to the plaintiffs to show that their neighborhoods would be adversely affected by the increased traffic flow.

We hold, therefore, that the plaintiffs had standing to challenge the issuance of the building permit. Not only was the damage to them different from that of the general public-- an increase of 10,000 cars per day over their neighborhood streets--but enjoining the City from issuing the building permit was also necessary for the trial court to assume its

equitable power of granting complete relief. It would not have been fair to the plaintiffs had the trial court ruled that the County could not zone Cameron Tract for commercial use, and to hold that the Developers had the right to start construction upon obtaining the building permit from the City.

RELATIONSHIP OF MASTER PLAN TO DUTY OF CITY IN PROCESSING BUILDING PERMIT APPLICATION

The Developers further argue that even assuming the plaintiffs had standing to challenge the issuance of the building permit, the City of Kalispell was nonetheless required to issue the building permit once it found the building plans to be in order. This argument is based on a distinction the Developers believe exists between zoning laws and the master plan. The Developers concede that the City could refuse to process a building permit if the proposed use was in violation of a zoning law, but the Developers argue that the City had no right to refuse to process a building permit solely because the proposed use would not be in compliance with the master plan. The Developers argue that because the land was unzoned, therefore permitting any use not specifically prohibited, the City had the duty to issue the building permit.

We first note that this argument cannot prevail because we have already held that the District Court had the right to grant complete relief by preserving the status quo until all issues were decided. Accordingly, the court had the right to order the City to stop processing the building permit application. But beyond this we also hold that the trial court was correct by holding in essence that the city officials could refuse to process a building permit application

-26-

where the proposed use is not in compliance with the master plan for the area involved.

We have already noted in this opinion that the statutory scheme for planning and zoning sets up a continuing process until finally all property within the County has been zoned. We have ruled that the zoning must be in substantial compliance with the master plan. The problem existing here on the building permit question is that the City was confronted with a twilight zone created by the county commissioners' refusal to zone unless the property owners involved make a special request (Resolution 291). It was this failure to zone which placed the city officials in a dilemma when the Developers applied for a building permit.

City officials knew they could refuse to process a building permit application if the proposed use was in violation of zoning law, but they did not know what to do where the proposed use was only in violation of the recommendations of the master plan. They proceeded, erroneously, we now hold, on the basis that if the land was unzoned they had a duty to process the building permit application.

In summary, we hold that the county commissioners used illegal zoning procedures and that injunctive relief was proper; that the county commissioners, had they zoned Cameron Tract as commercial, in addition to statutory violations, would have committed a most flagrant act of illegal spot zoning; that when zoning decisions are made (either creating zoning districts or promulgating applicable zoning regulations for the districts) they must be made in substantial compliance with the comprehensive plan (master plan); that the plaintiffs had standing to challenge the issuance of the building permit; that in any event, the

-27-

trial court had the right to stop the issuance of the building permit in order to preserve the status quo; and finally, that city officials have the right to refuse processing of a building permit application because the proposed use is in violation of the use recommended in the comprehensive plan (master plan).

The judgment granting injunctive relief is affirmed.

_____
Justice

We Concur:

_____
Chief Justice

_____

_____

_____
Justices