No. 95-285

IN THE SUPREME COURT OF THE STATE OF MONTANA

1995

---

MARGUERITE BOLAND; THOMAS F. and RUTH CORBALLY;
BRIAN BIRKENBUEL; HARRY and RUTH GARDNER; JEANNIE
and WILLIAM JUPKA; MARY LAIRD; WINONA and HILMUTH
KRUCKENBERG; MINNIE ISLER; EDWARD and SUZANNE MERLO;
SUSAN BOLAND; RICHARD and DONNA OSWEILER; WILLIAM
and CHARLENE KITTO; and BETTY McGAVIN,

   Plaintiffs and Appellants,

 v.

CITY OF GREAT FALLS, MONTANA,

   Defendant and Respondent,

 and

TOP GUN, INC.,

   Intervenor/Defendant and Respondent.

---

APPEAL FROM: District Court of the Eighth Judicial District,
      In and for the County of Cascade,
      The Honorable Joe Hegel, Judge presiding.

COUNSEL OF RECORD:

  For Appellants:

    Marcia Birkenbuel, Attorney at Law,
    Great Falls, Montana

  For Respondent:

    David V. Gliko, City Attorney,
    Great Falls, Montana

  For Intervenor/Defendant and Respondent:

    J. Kim Schulke, Linnel, Newhall & Martin,
    Great Falls, Montana

---

**FILED**

Filed: FEB 2 - 1996

*Ed Smith*
CLERK OF SUPREME COURT
STATE OF MONTANA

Submitted on Briefs: December 21, 1995

Decided: February 2, 1996

Clerk

Justice Charles E. Erdmann delivered the opinion of the Court.

This is an appeal from an order issued by the Eighth Judicial District Court, Cascade County, granting defendants' motions for summary judgment. We affirm.

The issue on appeal is whether the rezoning of a 12.9 acre area from "A" residence use to "C" residence use constitutes illegal spot zoning.

FACTS

At issue in this case are four city blocks in the Central Avenue Addition to the City of Great Falls (the Property). The Property was previously owned by the Sisters of Providence (the Sisters) who for many years had operated the St. Thomas Orphanage on the Property. Several years ago the structures were torn down and the Property became vacant, being used only for a baseball diamond on the southwest corner. The baseball facility has since been removed.

The Property is located in an area zoned as an "A" residence district for use by single family residences and other permitted uses. The Property, however, has never been used for single family residences. Adjacent to the Property is a park, the old east side fire station which is now a warehouse, and a water tower. There is also a church and a two-family dwelling unit in the adjacent area.

In 1992, James Benson entered into an agreement with the Sisters to purchase the Property in order to construct a condominium development. Benson submitted an application to the

2

City-County Planning Board to change the zoning of the Property from "A" residence district, "A" area, to "C" residence district, "B" area, which would allow the condominium development. The Board held a hearing in February 1993. One written objection to the project was received within the time allotted. A number of people living near the Property appeared at the hearing and objected to the zone change. One property owner filed a letter and also spoke in support of the project. The Board recommended to the City Commission that the zone change be granted upon twelve conditions.

The City Commission set a hearing for April 6, 1993, to consider the adoption of Ordinance #2650. This ordinance would allow the rezoning based upon the conditions set by the Board. The public hearing was ultimately held on June 15, 1993. Ten people spoke in favor of the proposed zone change, while three people spoke in opposition. The Commission adopted the proposed ordinance subject to the completion of a zoning contract between Benson, the Sisters, and the City of Great Falls. Ultimately, the Commission approved the zoning contract and the condominium project.

On June 30, 1993, twenty-three residents of the adjoining area brought a declaratory judgment action seeking a determination that the rezoning action constituted illegal spot zoning and requesting that the Property be restored to its previous zoning classification. Plaintiffs and defendants filed motions for summary judgment. On May 4, 1995, the District Court granted defendants' motions for summary judgment and from this plaintiffs appeal.

3

STANDARD OF REVIEW

Under Rule 56(c), M.R.Civ.P., summary judgment is proper if the record discloses no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law. Lutey Const. v. State (1993), 257 Mont. 387, 389, 851 P.2d 1037, 1038. The parties stipulated that no genuine issues of material fact exist in this case. The standard that this Court applies in reviewing a grant of summary judgment is the same as that initially utilized by the trial court under Rule 56, M.R.Civ.P. McCracken v. City of Chinook (1990), 242 Mont. 21, 24, 788 P.2d 892, 894.

Since we are reviewing a discretionary exercise of the City's legislative authority, we must decide whether the zoning ordinance in question bears a reasonable and not arbitrary relationship to a permissible state objective. Anderson Ins. v. City of Belgrade (1990), 246 Mont. 112, 119-20, 803 P.2d 648, 652-53 (citing Cutone v. Anaconda-Deer Lodge (1980), 187 Mont. 515, 524, 610 P.2d 691, 696-97).

DISCUSSION

Does rezoning of a 12.9 acre area from "A" residence use to "C" residence use constitute illegal spot zoning?

Local municipal governments in Montana are empowered to enact zoning ordinances restricting the use of property in their jurisdictional area. Section 76-2-301, MCA, states that:

> For the purpose of promoting health, safety, morals, or the general welfare of the community, the city or town council or other legislative body of cities and incorporated towns is hereby empowered to regulate and

4

restrict the height, number of stories, and size of buildings and other structures; the percentage of lot that may be occupied; the size of yards, courts, and other open spaces; the density of population; and the location and use of buildings, structures, and land for trade, industry, residence, or other purposes.

A zoning ordinance enacted pursuant to this statute will be found to be a constitutional exercise of police power if it has a substantial bearing upon the public health, safety, morals or general welfare of the community. Anderson Ins., 803 P.2d at 650 (citing Freeman v. Board of Adjustment (1934), 97 Mont. 342, 352, 34 P.2d 534, 537).

The plaintiffs presented two separate issues on appeal. Their initial issue addresses whether the new zoning use is significantly different from the previous use, which is the first element of the "spot zoning" test. Their second issue addresses the second two elements of the "spot zoning" test. We will address both issues in the context of the "spot zoning" test previously adopted by this Court.

In Little v. Board of County Commissioners of Flathead County (1981), 193 Mont. 334, 631 P.2d 1282, we identified the following three factors that are generally present when illegal spot zoning occurs, which we restate as follows:

> 1. The requested use is significantly different from the prevailing use in the area.
>
> 2. The area in which the requested use is to apply is rather small, however, this factor is more concerned with the number of separate landowners benefited by the requested change than it is with the actual size of the area benefited.

5

3. The requested change is more in the nature of special legislation. In other words, it is designed to benefit only one or a few landowners at the expense of the surrounding landowners or the general public.

Little, 631 P.2d at 1289. We noted that the three factors are not mutually exclusive and cautioned that any definition of spot zoning must be flexible enough to cover the constantly changing circumstances under which the test may be applied. Little, 631 P.2d at 1289.

The plaintiffs contend that the City of Great Falls engaged in illegal spot zoning by singling out one small piece of property for a use that is significantly different from the surrounding area. The plaintiffs argue that the prevailing use in the area has been those uses allowed by the "A" residence zone which does not allow for multiple dwelling structures like those proposed by the condominium developer. Plaintiffs contend that if there is no significant difference between the types of dwelling units allowed in "A" zones and those allowed in "C" zones, there would be no need for designating distinct residence zones. Plaintiffs maintain there is a significant difference between a condominium development and a neighborhood of single family homes located on standard-sized city lots.

The City's position is that the proposed "residential condominium" use is similar to the surrounding single family residential use and that the zoning contract entered into by the parties provides the necessary restrictions to insure compatibility. The City also notes that the "A" residence zone does

6

permit "townhouses" as a conditional use and argues that townhouses are not significantly different in nature, density, and appearance from condominiums.

The proposed condominium project consists of single family attached units on the interior of the Property and single family detached units on the perimeter to act as a screen between the existing single family dwellings adjacent to the Property and the rezoned area. The City required the developer and the Sisters to enter into a zoning contract that included a number of restrictions in order to preserve the residential integrity of the Property. The requirement that the condominium units on the perimeter of the Property be single family detached units, along with the other restrictions required by the City, insure that the new development will be compatible with the surrounding area.

It should also be noted that despite the designation as an "A" residence district, the Property was originally used as the site for an orphanage and has never been used for single family residences. The old eastside fire station, now used as a warehouse, a water tower, a church and a two-family dwelling unit, none of which are single family residences, are located in the area adjacent to the Property.

While the maximum density level will be twenty-nine percent higher than if the Property were developed solely as single family detached residences, it is important to note that the "A" residence zone permits "townhouses" as a conditional use. In fact, the City

7

determined that "[t]he exact project proposed for the Property could be built as a townhouse project by submitting an amended plat to cause lot lines to be located on the common walls of the attached single family dwelling units . . . ." Moreover, if townhouse units were built where the single family detached condominium units are proposed, the density level would be even higher than that contemplated by this zone change.

We conclude that the proposed condominium project is essentially residential in nature and not significantly different from the prevailing use in the area. Therefore, the first prong of the Little test is not satisfied.

Having made that determination, we now must determine whether it is necessary to proceed to the final two elements of the Little test. In explaining the test, we stated that "[i]f spot zoning is invalid, usually all three elements are present or, said another way, the three statements may merely be nuances of one another." Little, 631 P.2d at 1289 (citing Hagman, Urban Planning and Land Development Control Law (1971) at 169). Since we held in Little that "usually" all three elements are required to establish illegal spot zoning, it is possible illegal spot zoning can occur in the absence of an element. We therefore find it necessary to examine the remaining elements of the test. Our review of the record reflects that the remaining elements of the Little test are not satisfied.

8

The second and third elements of the <u>Little</u> test must be analyzed together. The number of separate landowners affected by the rezoning relates directly to whether or not the rezoning constitutes special legislation in favor of only one person. Since none of the surrounding landowners have been granted permission to build condominiums on their property, plaintiffs argue that rezoning the Property benefits only the condominium developer. We determine that the plaintiffs' viewpoint is too narrow in its scope.

We agree with the plaintiffs that the primary focus of the second and third <u>Little</u> factors is not the benefit resulting from the development of the Property, but rather the benefit to landowners as a result of the rezoning. However, we disagree with plaintiffs' contention that only the condominium developer will benefit as a landowner from the zoning change.

Our review of the record indicates that the orphanage was razed on or about March 1983. After the building was razed, the Property was placed for sale and for approximately seven years prior to the proposed development the Sisters had received no serious offers to purchase the land. The Property has deteriorated over the years to the extent that it now contains a variety of nuisances and eyesores, including broken glass, animal excrement, noxious weeds, unkept and dead vegetation, unfilled basements, and abandoned boilers. The City offered testimony that the zoning change would increase the value and salability of the surrounding

9

property by eliminating the existing blight resulting from the nonuse of the lots and by eliminating the uncertainty of the future use of the Property, thereby benefitting the surrounding neighborhood. We therefore agree with the District Court which found that the zoning change would benefit the adjacent property owners whose property values would tend to increase from the project development. Thus, rezoning the Property will directly benefit more landowners than merely the individual developer. We therefore conclude the zoning change is not in the nature of special legislation designed to benefit only one landowner.

Having concluded that the zoning change does not constitute spot zoning, we must now determine whether Ordinance #2650 bears a reasonable relationship to the advancement of the public health, safety, morals or general welfare of the community. Section 76-2-301, MCA; Anderson Ins., 803 P.2d at 652.

The City recognized the community's need for adequate and affordable housing in its Mission and Goals Statement. As part of its comprehensive review of the zoning change request, the City Commission determined that rezoning the Property would address the community's housing shortage, as well as provide a positive economic benefit to the community as a whole. The economic benefit extends not only to the developer but also to the Sisters, the construction companies and local labor force, the potential condominium purchasers, and the local taxing authorities. While the rezoning ordinance applies to a four square block area, the

10

Commission examined a number of factors and determined that the rezoning benefits both directly and indirectly a significant number of landowners and has a substantial bearing on the general welfare of the community. Rezoning the Property to allow for the housing development is a reasonable exercise of the City's legislative authority.

Furthermore, the Commission addressed the integrity of the surrounding area in attempting to meet its need for additional housing. The Commission determined that there were adequate public improvements, including transportation routes, water and sewer facilities, schools, and parks in the surrounding neighborhoods. The zoning contract regulates and restricts the development to prevent overcrowding, traffic and parking problems, and junk structure problems. After a full and complete review of the circumstances, the Commission determined that the rezoning ordinance encourages the most appropriate use of the land and should have a negligible effect on the balance of land uses in the area.

> We have stated that:
>
> The purpose of zoning is not to provide for the highest or best use of *each* particular lot or parcel of land within the zones or community, rather it is to benefit the *community generally* by the sensible planning of land uses taking into consideration the peculiar suitabilities and most appropriate use of land *throughout the community*.

Anderson Ins., 803 P.2d at 651 (citing Cutone, 610 P.2d at 694).

We conclude that the rezoning ordinance does not constitute illegal spot zoning and that the City acted in a reasonable manner

11

and within its statutory power when it rezoned the Property. We hold that the District Court did not err in granting defendants' motions for summary judgment, and therefore, affirm the District Court's order.

_____
Justice

We concur:

_____
Chief Justice

_____

_____

_____
Justices

12

Justice Terry N. Trieweiler dissenting.

I dissent from the majority's conclusion and conclude that when the City of Great Falls rezoned a 12.9 acre area from "A" residence use to "C" residence use it engaged in classic spot zoning.

The majority opinion correctly sets forth the law regarding spot zoning. However, I disagree with its application of that law to the facts in this case.

For example, under the first criteria for spot zoning established in *Little v. Board of County Commissioners of Flathead County* (1981), 193 Mont. 334, 346, 631 P.2d 1282, 1289, the question is whether the proposed use is different than the prevailing use in the area. I conclude that the proposed condominium development was a significantly different use than the single-family residential use of the surrounding area. In an "A" residence district, only single-family dwellings are allowed. In a "C" residence district, apartment houses, multiple dwellings, and townhouses are allowed. Although, as the majority points out, townhouses are permitted as a conditional use in "A" residential districts, conditional uses are not automatically granted. Conditional uses are permitted only after submission of a detailed application, and after all the procedures pertaining to a zone change, including a public hearing, have been complied with.

Single-family residential use is substantially different than multiple-unit housing. In an "A" residential district, homes, along with the property on which the homes are located, are

13

individually owned. Each individual property owner is responsible and accountable for the maintenance of his or her own property. Ownership in a condominium unit, on the other hand, provides title to the dwelling unit, but no personal ownership of the land on which the unit is located. A condominium owner owns only a percentage interest in the common elements which include the land on which his or her dwelling unit is located. Individual unit owners have no personal control over maintenance of the real property on which they reside.

Furthermore, the population density of the area where this proposed condominium development is to be located will be twenty-nine percent higher than it would be if developed for single-family residential use. It logically follows that the traffic volume in the neighborhood can be expected to increase twenty-nine percent more following the development of the area for condominium use than it would following development of the area for single-family residential use.

Anyone who has ever lived in both a single-family residential area and a condominium development, or driven through the two different types of neighborhoods, knows that the character of each is entirely different from the other. In short, there is nothing similar about a condominium development and a single-family residential neighborhood. If the two types of neighborhoods were as similar as the City of Great Falls now contends, and as the majority now holds, then there would be no reason for the City of Great Falls to restrict condominium developments to class "C"

14

residential areas, rather than simply allow any type of residential construction in a class "A" residential area.

For these reasons, I conclude that the proposed use of the land in question was significantly different from the prevailing use in the area and I disagree with the majority's conclusion to the contrary.

In *Little*, we set forth the second and third factors to be considered as follows:

> Second, the area in which the requested use is to apply is rather small. This test, however, is concerned more with the number of separate landowners benefited by the requested change than it is with the actual size of the area benefited. Third, the requested change is more in the nature of special legislation. In other words, it is designed to benefit only one or a few landowners at the expense of the surrounding landowners or the general public.

*Little*, 193 Mont. at 346, 631 P.2d at 1289 (citations omitted; emphasis added).

The second test, as pointed out, is concerned with the number of separate landowners benefited by the requested change. In this case, only one landowner is benefited by the change. That is the owner who intends to develop the property for multiple-unit residential construction, and who will presumably profit more by developing it for that purpose, rather than single-family residential use.

For the same reason, the third *Little* factor is satisfied in this case. The developer of the condominium in the middle of a single-family residential neighborhood will profit by his development at

15

the expense of those surrounding landowners who purchased and moved into their homes based on the assumption that the residential character of the neighborhood would remain as it was because of the zoning restrictions that were then in place.

In summary, I conclude that the proposed condominium development to which the appellants objected was significantly different from the prevailing use of their neighborhood, will benefit only the developer, and was in the nature of special interest legislation intended to benefit the developer at the expense of surrounding landowners and the public in general.

For these reasons, I dissent from the majority opinion. I would reverse the order of the District Court which granted summary judgment to the respondent and remand to the District Court with instructions to enter summary judgment in favor of the appellants.

_____
Justice

Justice William E. Hunt, Sr., joins in the foregoing dissenting opinion.

_____
Justice

16