No. 04-836

IN THE SUPREME COURT OF THE STATE OF MONTANA

2006 MT 47

CITIZEN ADVOCATES FOR A LIVABLE
MISSOULA, INC., a Montana Nonprofit Public
Benefit Corporation; JUDY SMITH; JOHN
FLETCHER; JIM PARKER; and JOHN COUCH,

   Plaintiffs and Appellants,

 v.

CITY COUNCIL and MAYOR OF THE CITY OF
MISSOULA, MONTANA, Acting as the Governing
Body of the City of Missoula, a Governmental Entity,

   Defendants and Respondents.


APPEAL FROM: The District Court of the Fourth Judicial District,
      In and For the County of Missoula, Cause No. DV 2003-870,
      Honorable Ed McLean, Presiding Judge


COUNSEL OF RECORD:

   For Appellants:

   Caryn Miske, Attorney at Law, Frenchtown, Montana

   For Respondents:

   Jim Nugent, City Attorney; Susan A. Firth, Deputy City
   Attorney, Missoula, Montana


        Submitted on Briefs: August 23, 2005

           Decided: March 7, 2006

Filed:

   _____
       Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1     Citizen Advocates for a Livable Missoula, Judy Smith, John Fletcher, Jim Parker, and John Couch (collectively, Appellants) appeal from the order of the Fourth Judicial District Court granting summary judgment to the City Council and Mayor of the City of Missoula, Montana (Respondents).  Appellants argue that the existence of material questions of fact precludes summary judgment, and further, that Missoula City Ordinance 3234 fails to comply with the City's growth policy and neighborhood plan.  We affirm.

¶2     We consider the following issues on appeal:

¶3     (1)   Did the District Court err by granting summary judgment in favor of Respondents?

¶4     (2)  Did the District Court abuse its discretion by denying Appellants' motion to compel the testimony of Dale McCormick?

¶5     Because we affirm the judgment of the District Court in favor of Respondents, we do not undertake review of Appellants' claim for attorney fees and costs.

## BACKGROUND

¶6     Offered for sale by the City of Missoula, the City properties occupying most of the 800 and 900 blocks in the West Broadway area were used primarily for heavy equipment maintenance, storage, and fueling of City vehicles.  The offered property bordered property owned by St. Patrick's Hospital (SPH).  As a result of the proximity of the offered lands, SPH bid on the property and was thereafter selected as the successful bidder by the City.

2

¶7    After discussions with Safeway, Inc., regarding Safeway's nearby grocery store in the 600 block of West Broadway, SPH submitted a zoning proposal seeking City approval of a zoning amendment which would allow construction of a large new Safeway grocery store on the lands purchased from the City by SPH, and upon that approval, for purchase of Safeway's existing store by SPH and expansion of SPH's current hospital facilities therein.  SPH sought to rezone the purchased City lands because that property's zoning classifications of C (Commerical), RH (High Rise), and P-2 (Public Lands and Institutions), did not permit SPH and Safeway's proposed development plans.

¶8    SPH's zoning proposal, also known as the Broadway-Scott Gateway Special District, or City Ordinance 3234, quickly caught the attention of the West Broadway community, and the attention was not always positive.  On December 4, 2002, the Northside/Westside Neighborhood Council unanimously declared its opposition to the zoning proposal.  Thereafter, on January 7, 2003, Office of Planning and Grants (OPG) city planner Dale McCormick noted OPG staff's displeasure with the zoning proposal at a presentation before the Missoula Consolidated Planning Board (Planning Board). According to McCormick, OPG seriously questioned whether the zoning proposal complied with relevant planning documents—i.e., the 1998 Missoula Urban Comprehensive Plan, the 2000 Joint Northside/Westside Neighborhood Plan, and the 2002 Missoula County Growth Policy.  Specifically, McCormick and the OPG staff believed that construction of a new Safeway mega-store in conjunction with the rezoning of the former City lands (1) failed to reflect the residential and small business character of the

3

district, (2) would create traffic congestion, and (3) did not encourage the most appropriate use of land. Ultimately, OPG recommended that the Planning Board deny the zoning proposal.

¶9  After receiving OPG's recommendations, the Planning Board received public comment on the zoning proposal. While some supporting comments were received—e.g., proponents argued expansion of SPH and a new modern Safeway store would create much needed jobs and modernization in the area—most of the comments opposed the proposal—e.g., residents believed that the rezone and resulting new construction would hurt the historic character of the community, create an area unfriendly to pedestrians, and violate the goals and objectives outlined in the 2000 Joint Northside/Westside Neighborhood Plan.

¶10  After a hearing on January 7, 2003, and despite strong staff and public opposition, the Planning Board voted to approve the zoning proposal. The Board noted that the rezoning and subsequent construction of a new Safeway would (1) stabilize grocery shopping in the area, (2) support mixed uses of the area, and (3) provide an anchor institution which would attract more businesses to the area. In approving SPH's zoning proposal, the Planning Board did not recommend any changes in the proposal or conditions for the approval thereof.

¶11  After approval by the Planning Board, the zoning proposal went before the Missoula City Council (City Council), which held ultimate authority to approve or deny the request. After reviewing the Planning Board's findings and the public comment,

4

several City Council members expressed concern with aspects of the proposal. Consequently, the City Council rejected the Planning Board's recommendation for unconditional approval and, instead, requested that OPG recommend conditions of approval which would amend the zoning proposal to address the Council's concerns.

¶12 After further OPG consideration, that office recommended the placement of seventeen conditions on SPH's proposal. Those conditions responded to many of the concerns expressed by the public, including (1) the size and design of the proposed Safeway facility, (2) the lack of mixed-use and residential character of the initial proposal, and (3) the traffic and pedestrian problems generated by the initial proposal. Dale McCormick, the lead OPG planner assigned to the proposal, noted that the revised zoning proposal, with its new conditions, was "substantively different from what St. Patrick Hospital originally proposed." He later wrote that the revised proposal "move[d] toward compliance" with the City Center/Mixed Use land designation aspect of the Northside/Westside Neighborhood Plan, better integrated the proposed Safeway structure with the current look and feel of the community, and lessened the traffic congestion which seemed likely to arise under the original zoning proposal.

¶13 After consideration of the revised zoning proposal, the City Council approved it on an eight to four vote on September 22, 2003. Thereafter, Appellants initiated this action, arguing that the revised proposal violated the 2002 Missoula County Growth Policy and the 2000 Joint Northside/Westside Neighborhood Plan.

5

¶14   Respondents filed a motion to dismiss on May 5, 2004, which the District Court thereafter converted into a motion for summary judgment. The District Court held a hearing on that motion on August 23, 2004, at which Appellants presented five witnesses who testified that the zoning proposal violated the Missoula County growth policy and related neighborhood plan. Nonetheless, the District Court granted summary judgment to Respondents, concluding that there were no genuine issues of material fact and that the City Council did not abuse its discretion when it adopted the zoning proposal.

¶15   Appellants appealed on October 26, 2004.

## STANDARDS OF REVIEW

¶16   This case is before us on a grant of summary judgment. We review district court grants of summary judgment *de novo*. *Abraham v. Nelson*, 2002 MT 94, ¶ 9, 309 Mont. 366, ¶ 9, 46 P.3d 628, ¶ 9. Summary judgment is "an extreme remedy, and is only appropriate when there is no genuine issue as to any material fact such that the moving party is entitled to judgment as a matter of law." *Patterson v. Verizon Wireless*, 2005 MT 261, ¶ 9, 329 Mont. 79, ¶ 9, 122 P.3d 1193, ¶ 9. Where there are genuine issues of material fact, summary judgment is inappropriate. *Patterson*, ¶ 9.

¶17   We review a district court's conclusions of law to determine if they are correct. *Steer, Inc. v. Department of Revenue* (1990), 245 Mont. 470, 474-75, 803 P.2d 601, 603.

¶18   We review a district court's denial of a motion to compel discovery for abuse of discretion. *Circle S Seeds of Montana, Inc. v. T&M Transporting, Inc.*, 2006 MT 25, ¶¶ 14, 25, 331 Mont. 76, ¶¶ 14, 25, ___ P.3d ___, ¶¶ 14, 25. "A district court abuses its

6

discretion when it acts arbitrarily without employment of conscientious judgment or exceeds the bounds of reason, resulting in substantial injustice." *State v. Riggs*, 2005 MT 124, ¶ 18, 327 Mont. 196, ¶ 18, 113 P.3d 281, ¶ 18.

## DISCUSSION

### *1. Did the District Court err by granting summary judgment in favor of Respondents?*

¶19 Appellants argue that City Ordinance 3234 (the zoning proposal) as approved by the Missoula City Council violates both § 76-2-304, MCA (2003), and Missoula City Ordinance § 19.72.040, and further, does not substantially comply with the Missoula County Growth Policy and 2000 Joint Northside/Westside Neighborhood Plan.

¶20 To assist in community planning and the orderly development of its governmental units and environs, local governments are authorized to create planning boards. Section 76-1-101, MCA (2003); *see also Ash Grove Cement Co. v. Jefferson County* (1997), 283 Mont. 486, 494, 943 P.2d 85, 90. Further, "[i]n counties . . . where a planning board has been created, the preeminent planning tool is the comprehensive jurisdiction-wide development plan . . ." which is today known as a "growth policy."[1] *Ash Grove*, 283 Mont. at 494, 943 P.2d at 90; *see also* § 76-1-106, MCA (2002). A growth policy "essentially surveys land use as it exists and makes recommendations for future planning . . . ." *Ash Grove*, 283 Mont. at 494, 943 P.2d at 90. By statute, a growth policy may include a neighborhood plan, and that plan must be consistent with the growth policy.

---

[1] The "growth policy" was formerly known as a "master plan." *See* § 76-1-106, MCA (1997). The Legislature made the change from "master plan" to "growth policy" in 1999, though the substance and effect of the actual document is the same. *See compilers comments to* § 76-1-106, MCA (1999).

7

Section 76-1-601(4)(a), MCA (2003). The statutory scheme includes § 76-1-605, MCA (2003), entitled "Use of adopted growth policy," which states, in pertinent part, as follows:

> **Use of adopted growth policy.** (1) Subject to subsection (2), after adoption of a growth policy, the governing body within the area covered by the growth policy pursuant to 76-1-601 must be guided by and give consideration to the general policy and pattern of development set out in the growth policy in the:
>
> . . .
>
> (c) adoption of zoning ordinances or resolutions.
>
> (2)(a) A growth policy is not a regulatory document and does not confer any authority to regulate that is not otherwise specifically authorized by law or regulations adopted pursuant to the law.
>
> (b) A governing body may not withhold, deny, or impose conditions on any land use approval or other authority to act based solely on compliance with a growth policy adopted pursuant to this chapter.

¶21 "The establishment of zoning districts is governed by statute in Montana," *Ash Grove*, 283 Mont. at 493, 943 P.2d at 89, and pursuant to those statutes, a municipality such as the City of Missoula may create zoning districts. *See* § 76-2-301 et seq., MCA (2003). Zoning regulations are to be made, among other things, "in accordance with a growth policy . . . ." Section 76-2-304, MCA (2003).

¶22 A question we have previously resolved is again raised here, that is, how closely a growth policy and neighborhood plan must be followed by a city when it zones lands pursuant to the statutory scheme. The statutes noted above are somewhat contradictory. Section 76-1-605, MCA (2003), provides that "the governing body within the area

8

covered by the growth policy pursuant to 76-1-601 *must be guided by and give consideration* to the general policy and pattern of development set out in the growth policy in the: . . . (c) adoption of zoning ordinances or resolutions." (Emphasis added.) On the other hand, § 76-2-304, MCA (2003), states that "[z]oning regulations must be . . . made *in accordance* with a growth policy . . . ." (Emphasis added.) The confusion is evident when one tries to reconcile these two statutes, since the former seems to require mere *consideration* of a growth policy in zoning decisions, while the latter seems to require a stricter *adherence* to the growth policy.

¶23 We previously reconciled this statutory incongruence in *Little v. Bd. of County Commissioners* (1981), 193 Mont. 334, 349-53, 631 P.2d 1282, 1290-93.[2] There, after struggling with the language of the statutes and considering the purposes of planning, we reasoned:

> To require strict compliance with the master plan would result in a master plan so unworkable that it would have to be constantly changed to comply with the realities. The master plan is, after all, a plan. On the other hand, to require no compliance at all would defeat the whole idea of planning. Why have a plan if the local governmental units are free to ignore it at any time?

*Little*, 193 Mont. at 353, 631 P.2d at 1293. Ultimately, we concluded that the statutes required governmental zoning bodies to "substantially comply" with the master plan or growth policy. *Little*, 193 Mont. at 353, 631 P.2d at 1293. This "substantial compliance" standard has remained unchanged since *Little*. *See Ash Grove*, 283 Mont. at 497-98, 943

---

[2]It should be noted that *Little* involved the interplay between § 76-1-605, MCA, and § 76-2-203, MCA (county zoning), and not between § 76-1-605, MCA, and § 76-2-304, MCA (municipal zoning), as here.

P.2d at 92; *Bridger Canyon Property Owners' Association, Inc. v. Planning & Zoning Commission* (1995), 270 Mont. 160, 169, 890 P.2d 1268, 1273.

¶24 Recently, however, the 2003 Legislature amended § 76-1-605, MCA, adding the following language:

> (2)(a) A growth policy is not a regulatory document and does not confer any authority to regulate that is not otherwise specifically authorized by law or regulations adopted pursuant to the law.
>
> (b) A governing body may not withhold, deny, or impose conditions on any land use approval or other authority to act based solely on compliance with a growth policy adopted pursuant to this chapter.

Section 76-1-605(2), MCA (2003).[3] The question then becomes how this new statutory language will affect *Little's* "substantial compliance" standard.

¶25 From its plain reading, it may be assumed that the 2003 legislation was intended to reduce in some fashion the reliance which local governing bodies are required to place upon growth policies when making land use decisions. However, although alluding to the passage of the new statute, both Appellants and Respondents have nonetheless framed their arguments regarding the validity of Ordinance 3234 under *Little's* "substantial compliance" standard, and offer no argument in support of a change in the standard.[4] Consequently, and because the outcome is not dependent upon an interpretation of the

---

[3]The 2003 amendments to § 76-1-605, MCA, were effective as of May 9, 2003. *See compilers comments to* § 76-1-605, MCA (2003); Sec. 7, Ch. 599, L. 2003.

[4]We note Respondents argue that, as a result of the 2003 legislation, the growth policy is no longer a regulatory document. However, they assert the zoning proposal should be upheld as substantially complying with the growth plan.

10

new statute, we will undertake the arguments as presented—pursuant to the "substantial compliance" standard. While mindful of the statutory changes, we leave for another day the question of what effect the 2003 legislation has had on the "substantial compliance" standard.

¶26 Appellants argue that the zoning proposal does not substantially comply with the Joint Northside/Westside Neighborhood Plan for the following reasons. First, the proposal does not comport with the neighborhood plan's goal to maintain a sense of history and protect key landmarks. Second, the proposal, including Safeway's new facility, will increase traffic congestion and create a pedestrian unfriendly environment, which they claim violate key principles of the neighborhood plan. Finally, the scale of the proposed "big box" style Safeway facility is inconsistent with the residential and small business character of the neighborhood, which they argue the neighborhood plan seeks to preserve.

¶27 Respondents counter by arguing that the zoning proposal, and the resulting SPH expansion and Safeway construction, stabilize two of the neighborhood's most important "anchor institutions"—Safeway and SPH, thereby fulfilling a neighborhood plan goal to expand and enhance existing businesses. Further, Respondents argue that the seventeen conditions attached to the proposal by the OPG and approved by the City Council specifically address public concerns about the project, and likewise, insure that the proposal complies with the neighborhood plan. Given the provisions of the planning documents cited by Respondents, we concur with their argument.

11

¶28 Appellants correctly note that certain aspects of the SPH zoning proposal are not in harmony with the neighborhood plan. For instance, language in the plan supporting a residential and small business environment would militate against approval of a "big box" style grocery store in the West Broadway neighborhood. Likewise, it appears as though the historic city shop building will be razed, a strike against preservation of the neighborhood's history. However, at the same time, it is also apparent that SPH and Safeway are specifically considered two of the most important of the neighborhood's "anchor institutions," and it is clear that the neighborhood plan strives to support those institutions. First, Neighborhood Economy Goal "A" of the plan generally provides:

> Goal A: Encourage existing neighborhood businesses to stay in the neighborhoods and to expand or enhance their current operations.

Further, the neighborhood plan addresses the importance of Safeway and SPH by name, stating that:

> [h]ow businesses like St. Patrick Hospital . . . and Safeway conduct business in the neighborhoods has a significant effect on the economic character and health of the area. Institutions and enterprises like these form the core of the neighborhood economy and provide critical assets to both business and residential neighbors.

Given that the plan specifically identifies Safeway and SPH as critical neighborhood entities, Appellants faced a difficult challenge in arguing that a zoning proposal which promotes the enhancement of these named entities is inconsistent with the planning goals and documents.

¶29 We also note that the seventeen OPG conditions attached to the zoning proposal substantially addressed early concerns that the proposal was not in compliance with the

12

neighborhood plan. As explained by Dale McCormick, the amended proposal dedicated more land to residential housing, reduced the size of the proposed Safeway grocery store, and made the proposed facility more pedestrian friendly. McCormick reiterated this point in a memo to the Missoula City Attorney's Office, noting that:

> In contrast to the initial proposal, the current approved building plans move toward compliance with the Goals and Action Items of the City Center/Mixed-Use Corridor land use designation specified in the Northside/Westside Neighborhood Plan . . . .

In response to concerns that the zoning proposal and proposed Safeway did not support residential use, McCormick also stated that:

> The [revised] proposal requires residential development for up to 32 new dwelling units on 10.6% of the site fronting the Pine Street residential neighborhood compatible with the neighborhood character . . . .

¶30 Appellants make much of the fact that some parts of the proposed Safeway development—i.e., the proposed gas station and razing of the City shop building—are not consistent with the neighborhood plan. However, it cannot be denied that the proposal is very consistent with other parts of the plan. Surely, not every zoning proposal will be consistent with every goal and objective expressed in a city's growth plan documents. To impose such a requirement would remove flexibility from a city's review of zoning proposals and make growth policies a rigid regulation, even exceeding the standard of "substantial compliance." Consequently, we conclude that the SPH zoning proposal, as modified and approved by the Missoula City Council, substantially complies with the growth plan.

13

¶31 Appellants make three additional arguments as to why summary judgment was inappropriate. First, they argue that the existence of genuine issues of material fact should have precluded summary judgment. However, we agree with the District Court. Although Appellants claim that their witnesses created questions of material fact by testifying to their belief that the zoning proposal did not comply with the relevant planning documents, that question is more of a determination of law, rather than fact, and does not preclude summary judgment.

¶32 Second, Appellants argue that the zoning proposal constitutes illegal spot zoning. As we said in *Little*, "[g]enerally . . . three factors enter into determining whether spot zoning exists in any given instance." *Little*, 193 Mont. at 346, 631 P.2d at 1289. Those factors are (1) whether the requested use is significantly different from the prevailing use in the area, (2) whether the area which is being rezoned is rather small, and looks to benefit a small number of persons, and (3) whether the rezone appears to be more in the nature of special legislation, designed to benefit a few landowners at the expense of the surrounding landowners or the general public. *Little*, 193 Mont. at 346, 631 P.2d at 1289. Finally, we noted in *Little* that, "[i]f spot zoning is invalid, usually all three elements are present . . . ." *Little*, 193 Mont. at 346, 631 P.2d at 1289.

¶33 Here, the zoning proposal and proposed Safeway facility are not significantly different from prior uses and zoning within the 800 and 900 blocks of the West Broadway community. Similar to the former zoning classifications of C (Commerical), RH (High Rise), and P-2 (Public Lands and Institutions), the current zoning proposal

continues to provide for a mixed use of residential and business uses. Furthermore, the Planning Board noted that other "big box" grocery stores have historically used the area, specifically "the Big Broadway," illustrating that the proposed Safeway is not "significantly different" from past uses.

¶34 Finally, while the zoning proposal certainly benefits Safeway and SPH, we cannot conclude that the benefit is conferred at the expense of the general public. To the contrary, as a matter of adopted policy under the neighborhood plans, the health of Safeway and SPH is deemed to be in the public's interest. For that reason, and for the others listed above, we agree with the District Court that the zoning proposal does not constitute illegal spot zoning.

¶35 Appellants also offer an argument that the City Council violated Missoula City Ordinance § 19.72.040 by not adopting findings of fact when it evaluated the zoning proposal. However, Appellants have made this procedural argument for the first time on appeal, which may be the reason this issue was not addressed by the District Court. Although Appellants asserted in their Amended Complaint that the City Council had violated Ordinance § 19.72.040, their claim in that regard was that the ordinance required the Council to ensure satisfaction of the twelve substantive requirements listed in the ordinance, and that this proposal "does not comply with at least three of the twelve criteria." Appellants did not assert that the Council had violated the ordinance by failing to adopt findings of fact. "It is well established that this Court will not review an issue that was not raised in the district court. 'It is fundamentally unfair to fault the trial court

15

for failing to rule correctly on an issue it was never given the opportunity to consider.'"

*Paulsen v. Flathead Conservation District*, 2004 MT 136, ¶ 37, 321 Mont. 364, ¶ 37, 91

P.3d 569, ¶ 37 (quoting *Day v. Payne* (1996), 280 Mont. 273, 276, 929 P.2d 864, 866).

Therefore, we decline to reach the issue.

***2. Did the District Court abuse its discretion by denying Appellants' motion to compel the testimony of Dale McCormick?***

¶36    In preparation for the September 7, 2004, hearing, Appellants' attorney deposed

Dale McCormick on September 2, 2004, because McCormick could not attend the

hearing.  Shortly after the deposition, because McCormick did not answer questions to

Appellants' counsel's satisfaction, Appellants filed a motion to compel McCormick's

testimony during the hearing.  The District Court denied that motion in its order of

September 27, 2004, citing the motion's vagueness as the basis for its denial.

¶37    As noted above, we review a district court's denial of a motion to compel

discovery for abuse of discretion.  *Circle S Seeds*, ¶¶ 14, 25.  Here, in moving to compel

McCormick's testimony, Appellants did not cite to any particular questions which were

unsatisfactorily answered, and only vaguely referenced the subject matter they sought to

explore more fully.  On the basis of these assertions, the District Court concluded that:

> As the motion is too vague for either the City Council's attorney or this
> Court to respond in any intelligent substantive manner, the motion fails on
> its face as a matter of law.

We conclude that the District Court did not abuse its discretion in determining that the

motion was too vague and lacked the specificity needed to rule upon it.  As such, it

committed no error.

16

¶38    The District Court is affirmed.


                                        /S/ JIM RICE


We concur:

/S/ KARLA M. GRAY
/S/ PATRICIA COTTER
/S/ JAMES C. NELSON
/S/ BRIAN MORRIS