No. 05-179

IN THE SUPREME COURT OF THE STATE OF MONTANA

2006 MT 132

_____

NORTH 93 NEIGHBORS, INC.,

        Plaintiff and Appellant,

   v.

BOARD OF COUNTY COMMISSIONERS OF FLATHEAD
COUNTY, acting as the governing body of the County of
Flathead, a government entity, and WOLFORD DEVELOPMENT
MONTANA, LLC, Intervenor,

        Defendants and Respondents.

_____

APPEAL FROM:    District Court of the Eleventh Judicial District,
                    In and for the County of Flathead, Cause No. DV 2003-637A
                    The Honorable Stewart E. Stadler, Judge presiding.

COUNSEL OF RECORD:

      For Appellant:

           David K. W. Wilson, Jr., Reynolds, Motl & Sherwood, PLLP, Helena,
           Montana

      For Respondent Flathead County Board of Commissioners:

           Alan F. McCormick and William T. Wagner, Garlington, Lohn &
           Robinson, PLLP, Missoula, Montana

      For Respondent Wolford Development Montana, LLC:

           Kristin L. Omvig and Scott D. Hagel, Crowley Haughey Hanson Toole &
           Dietrich, PLLP, Kalispell, Montana

           Ken Kalvig, Scott & Kalvig, Kalispell, Montana

      For Amicus Montana Smart Growth Coalition:

           Richard R. Thweatt, Attorney at Law, Helena, Montana

                                     _____
                              Submitted on Briefs:  December 13, 2005
                                       Decided:  June 13, 2006

Filed:

              _____
                            Clerk

Justice Brian Morris delivered the Opinion of the Court.

¶1    A citizens' group challenges the decision of its local elected officials to amend various planning documents to facilitate the development of a large suburban shopping mall on land that formerly had been used for agricultural purposes. The citizens' group, North 93 Neighbors, Inc. (Neighbors), appeals from an order of the Eleventh Judicial District, Flathead County, affirming the Flathead County Board of Commissioner's (Board) decisions to amend the Flathead County Growth Policy (Growth Policy) and to amend portions of the Flathead County Zoning Regulations (Zoning Regulations). We affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

¶2    Neighbors present the following issues on appeal:

¶3    1.    Whether the Board developed a factual record sufficient to overcome Neighbors's claim that it abused its discretion by failing to support its decisions to amend the Growth Policy and the Zoning Regulations with independently adopted findings of fact.

¶4    2.    Whether the Growth Policy documents suffer from fatal internal inconsistencies.

¶5    3. Whether the Wolford Amendment conflicts with the Growth Policy.

¶6    4. Whether the Zoning Amendment constitutes illegal spot zoning.

**FACTUAL AND PROCEDURAL HISTORY**

¶7    This case involves the long, convoluted, and sometimes fractious history of planning and zoning in Flathead County. The Board and the Kalispell City Council

2

created the Kalispell City-County Planning Board in 1965. Flathead County and the cities of Kalispell, Whitefish, and Columbia Falls established the Flathead Regional Development Office (FRDO) in 1971 to provide planning staff and administrative services for Flathead County and the three cities. The Board and the Kalispell City Council adopted the Kalispell City-County Master Plan (City-County Plan) in 1986.

¶8 The City-County Plan includes a master plan map and goals in twelve specific areas, including growth management, environment, economy, land use, and agriculture, along with specific objectives for each of these goals. The Board also adopted the Flathead County Master Plan (County Plan) in 1987 to cover those areas not otherwise covered by the City-County Plan. The County Plan discusses five elements: agriculture, land use, transportation, public facilities, and parks and open space.

¶9 Growth pressure in Flathead County soon spelled the end of county-wide and cooperative planning efforts. For our purposes, the first chink in county-wide planning came when the Board adopted the Stillwater Neighborhood Plan (Stillwater Plan) as an amendment to both the County Plan and the City-County Plan in 1990. The Board then revised the Stillwater Plan in 1992 to include an additional 40 acres for a total plan area of 340 acres. The Stillwater Plan provides for the construction of a golf course, hotel and conference center, commercial development, and residential single-family and townhouse development. The Board zoned the property as resort commercial, residential apartment, and suburban agriculture consistent with the Stillwater Plan. The Stillwater Plan never materialized, but the planning and zoning amendments remained in effect.

¶10 Flathead County withdrew from the FRDO and the 1971 planning agreement with

the City of Kalispell in 2001. The Flathead County Planning and Zoning Office (Planning Office) now provides planning and zoning administrative staff and services for Flathead County. The Board extended the jurisdiction of the Flathead County Planning Board (Planning Board) to include that portion of the county outside of the City of Kalispell that previously had been included in the jurisdictional area of the Kalispell City-County Planning Board. The Board created a new Growth Policy in August of 2003 by combining the County Plan with those portions of the City-County Plan that covered lands outside the City of Kalispell.

¶11 Wolford Development Montana, LLC (Wolford) entered this Balkanized planning process when it submitted a request to the Planning Office. Wolford sought to amend the Growth Policy by revising and expanding the Stillwater Plan in order to accommodate the proposed Glacier Mall (Mall). Wolford's proposal (Wolford Amendment) sought to increase the size of the Stillwater Plan from 340 acres to 481 acres to accommodate a commercial, office and residential development. The Wolford Amendment proposed 271 acres for commercial, 64 acres for mixed use, 141 acres of suburban agriculture, and five acres for construction of a road. Wolford's application indicated that it proposed to set the agricultural land aside for the possible development of an on-site wastewater treatment and disposal system.

¶12 The Planning Office reviewed Wolford's application and submitted a report to the Planning Board and the Board. The Planning Office concluded that the Wolford Amendment complied with the Growth Policy. The Planning Board held a public hearing on September 10, 2003, to consider the Wolford Amendment. The Planning Board

4

adopted the Planning Office's report as findings of fact and recommended that the Board approve the amendment.

¶13    The Board then passed a resolution of intent to consider the Wolford Amendment on September 29, 2003.  The Board gave notice that it would take written public comment on the Wolford Amendment before October 31, 2003.  More than four thousand members of the public submitted public comment on the proposal, with over 57 percent opposing the Wolford Amendment.  The Board held a public meeting on November 5, 2003, wherein it voted to approve the Wolford Amendment despite the public opposition to the proposal.  The Board passed a resolution adopting the Wolford Amendment to the Growth Policy that same day.  The Board did not prepare or adopt any independent findings to support its decision and the Board did not analyze or discuss any of the issues raised by the public comments in its decision.

¶14    Wolford submitted an application to the Planning Office to rezone the now 481 acres within the Stillwater Plan boundaries on August 25, 2003, in anticipation of the Board's decision to amend the Growth Policy.  The Planning Office issued a report for the zoning change, noting that approval of the zoning change depended on approval of the amendment to the Growth Policy.  The Planning Office's report further noted that the proposed development would have a significant impact on traffic and "should be connected to public water and sewer as soon as practical."  The Planning Board held a public meeting on the zoning change on November 13, 2003.  Eight people spoke in favor and four people spoke in opposition to the zoning change (Zoning Amendment). The Planning Board voted to support the proposed Zoning Amendment and

5

recommended its passage to the Board that same day.

¶15 The Board held a public meeting on December 23, 2003, to consider the Zoning Amendment. Thirty members of the public spoke at the meeting in addition to Wolford's representatives. Fourteen people spoke in favor and 16 spoke in opposition to the Zoning Amendment, including three of Neighbors's board members. The Board unanimously voted to approve the Zoning Amendment immediately following the close of the public comment period. The Board again did not issue any independent findings of fact to support its decision, but the Board did state in its decision that it considered issues raised through the public comment process. The Board granted final approval of the Zoning Amendment on February 4, 2004.

¶16 Neighbors brought this action in the Eleventh Judicial District, Flathead County, challenging the Board's decisions to amend the Growth Policy and Zoning Regulations. Wolford intervened. The parties submitted cross-motions for summary judgment. The District Court denied Neighbors's motion for summary judgment and granted the Board's and Wolford's motions. This appeal followed.

**STANDARD OF REVIEW**

¶17 We review a district court's grant of summary judgment *de novo*, applying the same evaluation under Rule 56, M.R.Civ.P., as the district court. *Richards v. Knuchel*, 2005 MT 133, ¶ 12, 327 Mont. 249, ¶ 12, 115 P.3d 189, ¶ 12. We review a district court's conclusions of law to determine if they are correct. *Richards*, ¶ 12.

¶18 Amending a growth policy or a zoning designation constitutes a legislative act. Section 7-1-104, MCA. Courts review challenges to a governing body's decision for an

6

abuse of discretion.  *Schanz v. City of Billings* (1979), 182 Mont. 328, 335, 597 P.2d 67, 71.

## DISCUSSION

¶19    **1.    Whether the Board developed a factual record sufficient to overcome Neighbors's claim that it abused its discretion by failing to support its decisions to amend the Growth Policy and the Zoning Regulations with independently adopted findings of fact.**

### A.  Growth Policy

¶20    Neighbors contend that the Board's amendment of the Growth Policy without issuing independent findings of fact in support rendered its decision unlawful, an abuse of discretion, and arbitrary and capricious.  They argue that the Planning Office's report cannot serve as a substitute in light of the fact that the staff prepared its report before the Board received more than 4,400 public comments and thus the report did not, and could not, address any of the concerns raised by the public.  Neighbors assert that the Growth Policy language, statutory public participation provisions, and case law, taken together, required the Board to issue independent findings of fact in support of its decision.

¶21    We first examine the Growth Policy.  In counties where a planning board has been created, "the preeminent planning tool is the comprehensive jurisdiction-wide development plan, which is today known as a growth policy.  A growth policy essentially surveys land use as it exists and makes recommendations for future planning."  *Citizen Advocates  v. City Council*, 2006 MT 47, ¶ 20, 331 Mont. 269, ¶ 20, 130 P.3d 1259, ¶ 20 (internal citations and quotations omitted).  Neighbors argue that the Board must

substantially comply with the Growth Policy and that the Growth Policy requires the Board to issue independent findings of fact.

¶22 Section 76-1-605, MCA, provides that a governing body "must be guided by and give consideration to" its growth policy. We held in *Little v. Board of County Com'rs, Etc.* (1981), 193 Mont. 334, 353, 631 P.2d 1282, 1293, that local government units must substantially comply with comprehensive master plans. We noted that strict compliance would prove unworkable, but that requiring no compliance at all would defeat the whole idea of planning. *Little*, 193 Mont. at 353, 631 P.2d at 1293. Although *Little* involved the role of comprehensive master plans in zoning decisions, the principles set forth in *Little* regarding the role of master plans when making future planning decisions apply with equal force here. *See Ash Grove Cement Co. v. Jefferson County* (1997), 283 Mont. 486, 496, 943 P.2d 85, 91 (applying substantial compliance standard to local government unit's adoption of local vicinity plans). The substantial compliance standard set forth in *Little* and affirmed in *Ash Grove Cement* incorporates the statutory standard in § 76-1-605, MCA, of being guided by and considering a growth policy.

¶23 We see no tension between these two standards and therefore agree with Neighbors that the Board must substantially comply with its Growth Policy. We struggle, however, with Neighbors's claim that substantial compliance with the Growth Policy obligates the Board to issue independent findings of fact. Neighbors rely on the following language from the Growth Policy in arguing the Board's lack of substantial compliance:

> A Plan, to be effective, must be used.  Each time the Plan is consulted, because of an issue, those policies that are relevant should be identified.  *A finding should then be made as to the conformance of the identified policies to the issue.*  Where polices are not complied with or cannot be met, a specific finding should be made stating whether this is a clear violation of the policy or whether site conditions or extenuating circumstances exist and justify the violating of the policy or policies.  [Emphasis added.]

The question arises as to whether the Board substantially complied with the Growth Policy by identifying relevant issues and making findings regarding the conformance of the issues raised by the Wolford Amendment.

¶24   Neighbors further argue that the public participation provisions of the Growth Policy Act, §§ 76-1-602 through -604, MCA, contemplate that the Board consider issues identified through the public comment process.  This consideration, argue Neighbors, includes having the Board incorporate issues identified through the public participation process, not otherwise addressed in the Planning Office report, into its findings of fact in support of its decision to amend the Growth Policy.

¶25   These public participation statutes outline the necessary procedures for adopting and revising growth policies.  Section 76-1-604(3)(a), MCA, allows for governing bodies to revise a growth policy by following the same procedures for adoption of a growth policy.  The procedures require that a planning board hold a public hearing on a proposed growth policy before the submission of a growth policy to the governing body.  Section 76-1-602, MCA.

¶26   A planning board then considers the suggestions elicited at the public hearing and either recommends acceptance or rejection of the growth policy to the governing body.  Section 76-1-603, MCA.  The Planning Board held a public meeting on September 10,

2003, and heard 28 people speak in favor of the Wolford Amendment and 18 speak in opposition to the amendment. The Planning Board drafted a letter recommending approval to the Board, wherein it stated that it "discussed the proposal and considered the public testimony." The Planning Board further stated that it had adopted the Planning Office's report as findings of fact. The Planning Office prepared the report, however, before the Planning Board received any public comments on the Wolford Amendment.

¶27 The statutory scheme then requires the governing body to adopt a resolution of intention to adopt, adopt with revisions, or reject the proposed growth policy. Section 76-1-604(1), MCA. The Board adopted a resolution of intent to adopt the Wolford Amendment and then received over 4,400 comments from the public. The Board adopted a resolution to approve the amendment following the public comment period, wherein it stated that the Board had "considered the information presented to it since the adoption of [the] resolution of intent." Contrary to the Board's resolution to approve the Zoning Amendment, discussed below, this resolution did not expressly mention the public comments. Nothing in the record indicates what issues, aside from a request from the public to put the Wolford Amendment to a public vote, were raised by the public participation process. Commissioner Hall testified that he personally reviewed the comments, but that he could not speak for his fellow Commissioners. Nothing in the record indicates that the other members of the Board considered the public comments.

¶28 Neighbors analogize the Board's role in this process to that of an agency decision-maker in the administrative process under the Montana Administrative Procedures Act (MAPA). Neighbors cite to *Stewart v. Region II Child and Fam. Serv.* (1990), 242 Mont.

10

88, 93, 788 P.2d 913, 916, for the proposition that the "rules of agency review rely on the principle that the agency, and not the district court, is the finder of fact." According to Neighbors, a court should remand a case for appropriate findings "[i]f a factual question is essential to an agency's decision, and the agency's findings of fact are so insufficient that they cannot be clarified or are entirely absent . . . ." *Stewart*, 242 Mont. at 93, 788 P.2d at 916. Section 2-4-102(b) of MAPA admittedly excludes units of local government, such as the Board, from the requirements of MAPA, nevertheless Neighbors's analogy proves apt to a degree.

¶29 Neighbors argue that the Board effectively preempted judicial review through a process by which it "left no tracks." Neighbors contend that a reviewing court is left with the problem of evaluating the reasonableness of the Board's decision that boils down to the Board's claim that "it is okay because we said it is okay." We have faced this obstacle in the context of zoning changes approved by elected city councils. First in *Lowe v. City of Missoula* (1974), 165 Mont. 38, 525 P.2d 551, we reversed a zoning amendment based upon the city council's failure to address the statutory requirements for zoning amendments through the development of a factual record that could be reviewed by a court for an abuse of discretion. Later in *Schanz*, 182 Mont. 328, 597 P.2d 67, we determined that the information relied upon by the city council in approving the zoning amendment was "so lacking in fact and foundation" as to render the city council's decision clearly unreasonable and an abuse of discretion. We remanded to the city council for consideration of the statutory criteria. *Schanz*, 182 Mont. at 336, 597 P.2d at 71.

11

¶30    *Lowe* and *Schanz* involve zoning amendments rather than amendments to master plans or growth policies similar to the one at issue here. These same principles still apply. As a general principle of administrative law, the record developed by an agency, here the Board, serves "to flesh out the pertinent facts upon which a decision is based in order to facilitate judicial review." *Annex Books, Inc. v. City of Indianapolis*, 333 F. Supp. 2d 773, 782 (S.D. Ind. 2004). This requirement helps prevent "judicial intrusion into matters committed to administrative discretion by the legislature." *Annex Books*, 333 F. Supp. 2d at 782. The absence in the record of facts relied upon by the Board in making its decision to approve the amendment to the Growth Policy would place the Court in the untenable position of having to substitute its own judgment for the Board's judgment. *See Burgess v. Gallatin County Com'n* (1985), 215 Mont. 503, 507, 698 P.2d 862, 865.

¶31    The Board generally complied here with any such fact-finding requirements. The Planning Office reviewed Wolford's application and analyzed the Wolford Amendment. The Planning Office's report identified the relevant policies implicated by the Wolford Amendment and described its findings. For example, the Growth Policy lists Transportation as one of its major goal and policy elements. The report noted that the Wolford Amendment's proposal to extend Rose Crossing from Whitefish Stage Road to Highway 93 at Wolford's expense provides a positive transportation improvement for the County and helps remediate the Growth Policy's concern regarding a lack of suitable east-west traffic movement.

12

¶32 Further, one of the policies states that "[a]dditional commercial development in the Planning Jurisdiction along Highway . . . 93 . . . should be discouraged." The Planning Office seemingly justified deviation from this policy by concluding that it "is far better to locate potential projects of the scale contemplated by this change within a jurisdiction that is planned, has development standards, and is virtually adjacent to the largest existing city in Flathead County and adjacent to similar uses such as the Mountain View Plaza and the Spring Prairie Center." The Planning Office's report concluded that the "proposed amendment is consistent with the intent of the existing Growth Policy Plan policies and goals."

¶33 The Planning Board then adopted the Planning Office's report as findings of fact and passed a resolution recommending that the Board adopt the Wolford Amendment. The Board did not explicitly adopt the report as findings of fact. The Planning Office's report did identify the policies relevant to the Wolford Amendment. The report further analyzed the compliance, or lack of compliance, of the Wolford Amendment with the relevant policies. As discussed above, however, the Planning Office prepared the report before the Board opened the proposal to public comment. The Board received more than 4,400 comments from the public regarding the Wolford Amendment. The Board closed the public comment period on October 31, 2003, and amended the Growth Policy just five days later on November 5, 2003.

¶34 Nothing can be found in the record that discloses what issues, aside from calls from the public to put the Wolford Amendment to a public vote, were raised through the public participation process. As the Dissent notes, the Board expressed appreciation for

13

the public comments and thanked its clerk for preparing a tally of the comments. Dissent, ¶ 76. Commissioner Howard Gipe referenced a newspaper article that reported various organizations and individuals supported the change, and estimated that the breakdown for and against the Wolford Amendment was "about 50-50." The Board then denied the public's request to vote on the Wolford Amendment. The Board adopted the amendment immediately thereafter. Aside from these comments and the Board's vague reference to having "considered the information presented to it since the adoption of [the] resolution of intent" nothing in the record demonstrates that the Board, the Planning Board, or the Planning Office ever considered any issues, other than denying the public the opportunity to vote on the Wolford Amendment, raised through the more than 4,400 written public comments.

¶35 The Board failed to address the public comments in its decision-making and thereby failed "to flesh out the pertinent facts upon which [its] decision [was] based in order to facilitate judicial review." *Annex Books*, 333 F. Supp. 2d at 782. Accordingly, we cannot know whether the public raised novel issues not addressed by the Planning Office's report and whether the Board appropriately responded to those issues. The public participation statutes contemplate more than merely eliciting public comment. Section 76-1-603, MCA. Further, the Board must equip reviewing courts with a record of the facts it relied upon in making its decision to avoid judicial intrusion into matters committed to the Board's discretion. *Annex Books*, 333 F. Supp. 2d at 782.

¶36 We conclude that the Board's reliance upon the Planning Office's report was justified and appropriate to an extent. The Board's sole reliance on the report, prepared

14

before over 4,400 members of the public voiced their concerns, however, renders its decision to amend the Growth Policy unreasonable and an abuse of discretion. *See Schanz*, 182 Mont. at 336, 597 P.2d at 70. The Board has an obligation to consider the public comments and incorporate those comments into its decision-making process.

¶37 The District Court granted summary judgment based on the fact that the Board did not abuse its discretion in amending the Growth Policy. The District Court failed to account, however, for the issue of whether the Board considered matters raised through the 4,400 public comments. Absent any indication in the record that the Board considered these public comments, the Board cannot demonstrate that it satisfied its duty to flesh out the pertinent facts upon which it relied in approving the Wolford Amendment.

¶38 The District Court must evaluate whether the Board satisfied this obligation by requiring the Board to demonstrate what issues, if any, were raised through the public comment process that were not addressed by the Planning Office's report. The Board must further demonstrate to the District Court that it evaluated such issues with the requirements of the Growth Policy. As the parties initially filed cross-motions for summary judgment, the District Court on remand likewise must allow Neighbors to present evidence to refute the Board's assertions. We reverse and remand to the District Court for this limited purpose. *Schanz*, 182 Mont. at 336, 597 P.2d at 71. If the District Court determines that the Board failed to satisfy its obligation, or if the record proves insufficient to determine whether the Board complied, it should send the case to the Board for development of the factual record that it relied upon in making its decision to

15

amend the Growth Policy.

### B.  Zoning Regulations

¶39　Neighbors next contend that the zoning statutes and the Zoning Regulations require the Board to issue findings of fact in support of its decision to amend the zoning ordinance.  Neighbors assert that the Board's failure to issue findings of fact entitles them to summary judgment voiding and setting aside the Board's zoning decision.

¶40　Section 76-2-205, MCA, provides the process for amending a zoning ordinance. A board of county commissioners must publish a notice of a public hearing on the proposed zoning regulation amendment and provide the public an opportunity to be heard at the hearing.  Section 76-2-205(1) and (2), MCA.  A board then must review the recommendation from the planning board and make any revisions or amendments it deems proper based on the public comments received.  Section 76-2-205(3), MCA.  A board of county commissioners may then pass a resolution of intent to adopt the amendment.  Section 76-2-205(4).  If a board passes a resolution of intent to adopt an amendment to the zoning regulations it must publish notice of the resolution, and provide for a 30-day protest period.  Section 76-2-205(5), MCA.  A board must pass a final resolution adopting the amendment unless 40 percent of the landowners within the zoning district protest the amendment within the 30-day protest period.  Section 76-2-205(6), MCA.

¶41　Neighbors further assert that Flathead County's own Zoning Regulations require the Board to issue independent findings of fact.  Section 2.08.040 of the Zoning Regulations state that when "considering an application for amendment to the provisions

of these regulations or the Zoning Districts, the Planning Board and the Board . . . shall be guided by and adopt findings of fact based upon [the following 12 criteria]." The 12 criteria in § 2.08.040 of the Zoning Regulations mirror the criteria for considering a zoning amendment from § 76-2-203, MCA.

¶42 The Board must make zoning amendments in accordance with the 12 statutory and Zoning Regulation criteria. Section 76-2-203, MCA. Wolford's application to amend the zoning regulations addressed all 12 of these criteria at length. The Planning Office also addressed the 12 statutory criteria and issued a report outlining the Zoning Amendment in the context of the criteria. The Planning Board discussed the amendment, voted to recommend approval, and adopted the Planning Office's report as findings of fact.

¶43 The Board then held a public hearing on the proposed Zoning Amendment. The Board passed a resolution of intent to adopt the Zoning Amendment following the public hearing. The Board adopted a final resolution approving the Zoning Amendment at the conclusion of the required protest period, wherein it stated that it based its decision upon the recommendation of the Planning Board and public testimony. The resolution further stated that the Board made its decision in accordance with § 76-2-205, MCA. The Board did not expressly adopt the Planning Office's report as findings of fact. The Board did state, however, that it adopted the Zoning Amendment based upon the Planning Board's recommendation, and the Planning Board adopted the report as findings of fact. Further, the plain language of § 2.08.040 requires only that the Planning Board and the Board "be guided by and adopt findings of fact . . . ." Nothing requires that the Board separately

17

issue its own independent factual findings.

¶44    The applicable standard of review is whether the information upon which the Board based its decision "is so lacking in fact and foundation" that "it is clearly unreasonable and constitutes an abuse of discretion." *Schanz*, 182 Mont. at 335-36, 597 P.2d at 71. The Board reviewed the Planning Board's recommendation. The Planning Board discussed the Zoning Amendment, voted unanimously to recommend approval, and adopted the Planning Office's report as findings of fact. The Board considered public comment, including a statement by Sharon DeMeester, President of Neighbors, wherein she reviewed the 12 statutory criteria, and made its decision based upon these considerations. The Board thus followed the proper statutory and regulatory procedure for adopting zoning amendments and had sufficient evidence before it to make an informed decision.

¶45    Neighbors finally argue that this Court's decisions in *Lowe* and *Schanz* mandate reversal of the Board's decision because of the Board's failure to consider the 12 statutory criteria. *Lowe* and *Schanz* require governing bodies to consider the 12 statutory criteria from what is now § 76-2-203, MCA, before making changes to zoning regulations. *Lowe*, 165 Mont. at 40, 525 P.2d at 552; *Schanz*, 182 Mont. at 336, 597 P.2d at 71. The Planning Office's report outlines each of the 12 statutory criteria in detail as they relate to the Wolford's Amendment. The Planning Board adopted the report as findings of fact and recommended approval to the Board. The Board considered the Planning Board's recommendation. The Board also heard public comment on the 12 statutory criteria, and, unlike the amendment to the Growth Policy, expressly considered

18

those public comments before approving the Zoning Amendment. The Board therefore followed the requirement articulated in *Lowe* and *Schanz* before making changes to the Zoning Regulations. We agree with the District Court that the Board did all that the law required.

¶46 **2. Whether the Growth Policy documents suffer from fatal internal inconsistencies.**

¶47 Neighbors argue that the Growth Policy suffers from a fatal flaw because it contains internal inconsistencies. Neighbors allege that the Board failed to reconcile vast discrepancies when it combined the City-County Plan of 1986 with the County Plan of 1987 to create the new Growth Policy in August of 2003. Specifically, Neighbors point to three such inconsistencies.

¶48 Neighbors first argue that the Board premised its approval of the Stillwater Plan upon annexation of the area into the city of Kalispell and the area obtaining city services. Neither contingency has been realized. The City-County Plan likewise contains objectives of adopting a municipal annexation program. The County Master Plan, on the other hand, has no stated requirement that developments be annexed into the City. Second, Neighbors allege that the City-County Plan stresses joint administration between the City and County while the County Plan lacks any goals of joint administration. Finally, Neighbors point to the fact that the City-County Plan contains a table projecting future land use needs for the plan area in a number of categories, but the County Plan contains no such projection.

¶49 Neighbors rely on *BCPOA v. Planning & Zoning Com'n* (1995), 270 Mont. 160,

175, 890 P.2d 1268, 1277, for the proposition that "in order to effectively plan for the development of a planning and zoning district, the planning documents which comprise the development pattern must be internally consistent as well as consistent with companion planning documents." A clear conflict existed in *BCPOA*. The general plan and the zoning map specifically excluded single family housing in the base area. The zoning ordinance and base area plan, by contrast, contained a provision for high density subdivision in the same area. *BCPOA*, 270 Mont. at 167, 890 P.2d at 1272. The inconsistencies within the planning documents made it impossible to determine the appropriate population densities for the area. *BCPOA*, 270 Mont. at 173, 890 P.2d at 1276.

¶50 The alleged inconsistencies within the Growth Policy do not rise to the level of the inconsistencies in *BCPOA*. The annexation objective in the City-County Plan on which Neighbors rely provides for the adoption of "a municipal annexation program which coordinates with the Extension of Services Plan to aggressively deal with fringe developments setting the stage for immediate or future annexation so as to preserve the tax base of the city and eliminate future barriers to orderly growth." Neighbors assert that the Board premised its approval of the Stillwater Plan upon annexation into the City, but that the County Plan contains no objectives for annexation. Wolford counters that the Board considered annexation to be a future possibility, not an immediate requirement.

¶51 The Board amended both the City-County Plan and the County Plan by revising the Stillwater Plan in 1992. The 1992 Stillwater Plan Amendment contains an objective to "provide for public sewer services." As part of the strategy to provide for public sewer

20

services, the 1992 Stillwater Plan Amendment calls for development of an onsite engineered sewer system for the first 200 users. Only when use exceeds 200 users does the 1992 Stillwater Plan Amendment state that connection to the city of Kalispell sewage collection would occur and that the developer would seek annexation. We therefore agree with Wolford that the Board considered annexation to be a future possibility rather than an immediate requirement in approving the Stillwater Amendment. The Wolford Amendment to the Stillwater Plan also contains no requirement of annexation or hook up to city sewer services. Neighbors cannot establish that the alleged inconsistencies regarding annexation rise to the level of contradiction apparent in *BCPOA*, and thereby impede the planning process.

¶52 Neighbors next argue that the City-County Plan requires joint administration while the County Plan contains no such requirement. The City-County Plan contains a "goal" for administration wherein the city and county "jointly cooperate in promoting, guiding, and directing the planning jurisdiction's growth and development." The City-County Plan defines goals as "very long range statements about the future of a community, they give direction. They are, in essence, what the people of the Kalispell Planning Jurisdiction are striving for in terms of neighborhood and community environment, growth, community services, etc." The County Plan contains a similar goal for joint cooperation, wherein "[i]ntergovernmental cooperation between the three cities of Whitefish, Kalispell, and Columbia Falls and Flathead County should be encouraged . . . ." The Court must pause to scratch its collective heads and ponder whether the City-County Plan's "goal" for joint administration conflicts with the County Plan's goal of

21

"encouraging" intergovernmental cooperation. We are hard pressed to conclude that the City-County Plan and County Plan conflict on the topic of joint administration to such a degree as to impede the planning process.

¶53 Neighbors finally argue that the City-County Plan contains a table projecting future land use needs, while the County Plan does not. Once again, the City-County Plan's projections represent projections of future needs rather than binding criteria. Neighbors do not explain how this alleged inconsistency impedes the planning process. Both the City-County Plan and County Plan discuss similar goals in the areas of residential, commercial, and industrial development. We fail to see how the County Plan's omission of a future land needs projection impedes the planning process in light of the County Plan's discussion of goals in these same areas of residential, commercial, and industrial development. These goals largely mirror in relevant part the future land needs projections.

¶54 We recognize the City-County Plan and the County Plan are not identical. They do not suffer from internal inconsistencies, however, to such a degree that render them inherently unreliable. *BCPOA*, 270 Mont. at 173, 890 P.2d at 1276. The lack of significant inconsistencies arises from the intentionally vague and sometimes open-ended language employed in the two documents. The local elected officials in Flathead County have chosen to adopt planning documents that contain these ambiguities. *BCPOA* requires that the two plans be sufficiently consistent to allow public officials to follow them. *BCPOA*, 270 Mont. at 174, 890 P.2d at 1276. The Growth Policy, comprising the City-County Plan and the County Plan and all amendments thereto, despite the presence

22

of much vague and open-ended language, provides sufficient consistency for the Board to follow. The Board therefore did not exceed its authority or jurisdiction in amending the Growth Policy.

¶55 **3. Whether the Wolford Amendment is consistent with the Flathead Growth Policy.**

¶56 Neighbors next argue that the Wolford Amendment to the Growth Policy does not substantially comply with the Growth Policy, and therefore must be annulled and set aside. Section 76-1-601(4)(a), MCA, provides that growth policies may contain neighborhood plans. If a growth policy contains a neighborhood plan, such as the Stillwater Neighborhood Plan, such a plan must be consistent with the growth policy. Section 76-1-601(4)(a), MCA. We therefore note that the proper standard is not whether the Wolford Amendment substantially complies with the Growth Policy, as the parties have framed the issue, but whether the Wolford Amendment proves consistent with the Growth Policy.

¶57 Neighbors contend that the City-County Plan slated the area of the proposed Mall for annexation to the City. Neighbors further contend that the Board "has gone to great lengths to ensure that this massive development . . . is not annexed into the City and does not get connected to city water and sewer services" without providing any supporting authority for such a statement. As we already have determined that the Board did not premise its approval of the Stillwater Plan upon annexation into the city, and that the Wolford Amendment neither required nor precluded annexation into the city, we focus on the two other inconsistencies alleged by Neighbors.

23

¶58    Neighbors argue that the Wolford Amendment conflicts with the Growth Policy's goals pertaining to commercial development in the Kalispell area. Neighbors rely, in part, on a Planning Office report from 2001 for a previous application submitted by Wolford to locate the mall in the Evergreen area. Neighbors further rely on the 1987 County Plan's statement that "additional development in the planning jurisdiction along Highway . . . 93 should be discouraged." Neighbors finally argue that the development of agricultural land at the proposed Mall site conflicts with the Growth Policy.

¶59    The 2001 Planning Office report noted that "the development will cannibalize downtown Kalispell commercial operations, force vacancies in the existing business and redirect growth into the unincorporated portions of Flathead County." The Planning Office prepared this report in 2001 for location in a different part of Flathead County. More importantly, factors on the ground have changed significantly since 2001. The area has seen significant population growth. The proposed Mall now comports with the prevailing uses in the area. Thirty-six businesses surround the proposed Mall in all directions, including large box retailers such as Target, Home Depot, TJ Maxx, Lowes, Ross, Borders Books, and Costco. The proposed Mall admittedly may not serve to preserve downtown Kalispell retail operations, a fear expressed by the 2001 report. It will at least be located, however, among other "cannibalizing" sprawl developments that the Board previously had determined to be appropriate for the area.

¶60    We find similarly unpersuasive Neighbors's next contention that the Wolford Amendment conflicts with the Growth Policy because the County Plan discourages additional developments along Highway 93. The County Plan encourages development

"toward existing commercial areas either as expansion or infill." The Planning Office noted, however, that the County planned that area in 1992 (via the 1992 Amendment to the Stillwater Plan) for "future growth because of significant population growth and development in the Kalispell area . . . ." Flathead County thus amended the County Plan nearly fifteen years ago through enactment of the Stillwater Plan to create a new policy objective--one that allows for commercial development in the location of the proposed Mall. The Planning Office report noted that the surrounding areas were slated for large retailers and box stores, projects that have since been completed. The proposed Mall will be sited in an "existing commercial area."

¶61    Neighbors's final argument, that the development of agricultural land at the proposed site conflicts with the Growth Policy, fails to recognize that the Stillwater Plan, and the zoning in effect before the Wolford Amendment, also allowed for significant commercial and residential development at the proposed Mall location. The Wolford Amendment and Zoning Amendment designate 141 acres north of the proposed Mall for suburban agricultural zoning, an increase of 31 acres over the 2002 version of the Stillwater Plan.

¶62    We therefore conclude that the Wolford Amendment is consistent with the Growth Policy. We further conclude that the Board complied with this Court's directive in *Little*. *Little* dealt with zoning amendments that conflicted with the master plan. We noted that we were "aware that changes in the master plan may well be dictated by changed circumstances occurring after the adoption of the plan. If this is so, the correct procedure is to amend the master plan rather than to erode the master plan by simply refusing to

25

adhere to its guidelines." *Little*, 193 Mont. at 354, 631 P.2d at 1293. Here, the Board amended the Growth Policy directly, rather than attempting to erode it through zoning amendments. We remain mindful of the concerns regarding the pitfalls of piecemeal amendments to comprehensive planning documents expressed by Justice Leaphart and Justice Nelson in *Ash Grove Cement*, 283 Mont. at 500-01, 943 P.2d at 94-95 (Leaphart, J., and Nelson, J., specially concurring). Nevertheless, the Board followed the procedure we established in *Little* in amending the Growth Policy and we have not abandoned the *Little* standard.

¶63    **4. Whether the Zoning Amendment constitutes illegal spot zoning.**

¶64    Wolford moved for summary judgment on whether the Zoning Amendment constituted illegal spot zoning. Neighbors failed to present any evidence to the District Court to support its position. The District Court addressed the claim despite this omission. Neighbors now argue on appeal that the Board's decision to amend the Zoning Regulations constituted illegal spot zoning.

¶65    We consider three factors when determining whether a zoning amendment constitutes spot zoning. *Little*, 193 Mont. at 346, 631 P.2d at 1289. We first evaluate whether the requested use differs significantly from the prevailing use in the area. *Little*, 193 Mont. at 346, 631 P.2d at 1289. We next determine whether the area proposed for rezoning is small, although not solely in physical size. *Little*, 193 Mont. at 346, 631 P.2d at 1289. Finally, we evaluate whether the requested change resembles special legislation designed to benefit only one or a few landowners at the expense of the surrounding landowners or general public. *Little*, 193 Mont. at 346, 631 P.2d at 1289.

¶66    Wolford presented evidence to the District Court demonstrating that the proposed land uses in the Zoning Amendment were not significantly different from prevailing uses in the area.  Neighbors did not refute Wolford's assertions regarding the prevailing uses surrounding the proposed Mall.  Thirty-six businesses surround the proposed Mall in all directions.  One hundred and ten acres of commercially zoned property lies to the east of the area encompassing the proposed Mall.  This area includes the Spring Prairie Center and retail establishments such as Lowes and Costco.  Sixty acres make up the Mountain View Plaza Development to the south of the proposed Mall.  The Mountain View Plaza includes Home Depot, Target, Ross, TJ Maxx and Borders.  The 40-acre Semi-Tool complex also lies to the south and within 250 feet of the proposed Mall.  The Semi-Tool area is zoned County I-1 and allows for the same commercial uses that the Zoning Amendment allows, plus industrial uses.

¶67    The Zoning Amendment allows for zoning and uses consistent with the neighboring properties.  The County zoned the Stillwater Plan area for residential, commercial, and agricultural uses.  The Stillwater Plan allowed for 290 acres for High Density Residential and 50 acres for Resort Commercial.  Extending a preexisting zone classification to include a larger area does not constitute spot zoning.  *State ex rel. Gutkoski v. Langhor* (1972), 160 Mont. 351, 353, 502 P.2d 1144, 1146.  Additionally, we may consider the current zoning when evaluating whether the requested use differs significantly from the prevailing use in the area.  *Greater Yellowstone Coal. v. Bd. Of Com'rs*, 2001 MT 99, ¶ 23, 305 Mont. 232, ¶ 23, 25 P.3d 168, ¶ 23.  Because the areas surrounding the Wolford Amendment are largely commercial, and because the existing

27

zoning allowed for commercial development, we conclude that the Zoning Amendment does not allow for uses that differ significantly from the prevailing uses in the area.

¶68 We analyze the second and third elements of the *Little* test together. *Boland v. City of Great Falls* (1996), 275 Mont. 128, 134, 910 P.2d 890, 894. The number of separate landowners affected by the rezoning directly relates to whether the zoning constitutes special legislation designed to benefit only one person. *Boland*, 275 Mont. at 134, 910 P.2d at 894. Wolford is the sole owner of the parcel. Zone changes for property owned by one person, however, do not automatically equate to spot zoning. *Greater Yellowstone Coal.*, ¶ 27. We also consider whether the zoning change occurred at the expense of surrounding landowners or the general public and whether the requested use accords with the comprehensive plan. *Greater Yellowstone Coal.*, ¶ 21.

¶69 In *Greater Yellowstone Coal.* we evaluated whether the Gallatin County Commissioner's decision to amend the zoning regulations to allow for a large planned unit development project constituted spot zoning. *Greater Yellowstone Coal.*, ¶¶ 20-37. We concluded that the zoning request was in the nature of special legislation designed to benefit one or a few landowners at the expense of the surrounding landowners or general public. *Greater Yellowstone Coal.*, ¶ 32. We relied in part on the publicly owned nature of the surrounding land. The public owned 59 percent of the surrounding area, including some of the most significant wildlife habitat in the country. *Greater Yellowstone Coal.*, ¶ 32. Similarly, in *Little* we concluded that the Flathead County Commissioner's decision to rezone land from medium-density residential to allow for a regional mall was done at the expense of the surrounding landowners. *Little*, 193 Mont. at 348, 631 P.2d at 1290.

¶70 Unlike *Greater Yellowstone Coal.* and *Little*, similar uses surround the location of the proposed Mall. As noted above, the surrounding properties are largely commercial, including large box retailers. We already have determined that the Zoning Amendment's requested use comports with the Growth Policy. We therefore conclude that despite Wolford's sole ownership of the parcel, the Board did not enact the Zoning Amendment at the expense of surrounding landowners or the general public. *Greater Yellowstone Coal.*, ¶ 21.

## CONCLUSION

¶71 We affirm the District Court's determination that the Board adequately supported its decision to amend the Zoning Regulations with findings of fact. We affirm the District Court's ruling that the Growth Policy documents do not suffer from fatal internal inconsistencies and that the Wolford Amendment is consistent with the Growth Policy. We further affirm the District Court' determination that the Zoning Amendment does not constitute illegal spot zoning. We reverse and remand, however, for the District Court to evaluate whether the extensive public comments raised any new issues not addressed by the Planning Office's report and to determine whether the Board considered any such issues.

/S/ BRIAN MORRIS

We Concur:

/S/ W. WILLIAM LEAPHART
/S/ PATRICIA COTTER
/S/ JAMES C. NELSON

29

Justice Jim Rice dissenting.

¶72 With all due respect to the Court's sincere effort to navigate through the maze of the local planning process, I believe the opinion misapplies authority and imposes new, uncertain duties upon local governing bodies which will prove to be confusing and burdensome. Ultimately, I believe the opinion is inherently contradictory.

¶73 My primary concern is with the reasoning and holding under Issue 1A. The Court first addresses the standard of review, "agree[ing] with Neighbors that the Board must substantially comply with its Growth Policy," and citing *Little v. Board of County Com'rs, Etc.* (1981), 193 Mont. 334, 353, 631 P.2d 1282, 1293. *See* ¶¶ 22-23. The problem is that *Little* was a zoning case, and the substantial compliance standard adopted therein was for the purpose of reviewing zoning decisions vis-à-vis s growth policy. *Little*, 193 Mont. at 353, 631 P.2d at 1293. In contrast, the issue here is not a zoning decision's compliance with a growth policy, but, rather, an amendment to the Stillwater Neighborhood Plan, a part of the Growth Policy itself. Under § 76-1-601(4), MCA (2003), a growth policy may include one or more neighborhood plans, but they are optional. Contrary to the "substantial compliance" standard asserted by the Neighbors and applied by the Court, the statute governing such plans requires that "[a] neighborhood plan must *be consistent* with the growth policy." Section 76-1-601(4)(a), MCA (2003) (emphasis added.). This just makes common sense: there is no need to require that an amendment to a growth policy "substantially comply" with itself. Consistency is all that is required. Although the Court cites to *Ash Grove* in support of the "substantial compliance" standard, that case offers little assistance. The discussion

about the neighborhood or local vicinity plan ("LVP") at issue there was properly couched in terms of whether it was consistent with the county's Master Plan, and we concluded that "[t]hus, the LVP is *clearly inconsistent* with the Master Plan and violates the mandate of that Plan which authorizes local vicinity plans only to the extent they are *consistent* with the Master Plan and designed to implement it. Likewise, the LVP also violates the spirit and language of § 76-1-605, MCA . . . ." *Ash Grove Cement v. Jefferson County* (1997), 283 Mont. 486, 497-98, 943 P.2d 85, 92 (emphasis added). Although the Court also stated "that the County Commissioners failed to substantially comply with the Master Plan in adopting the LVP," for the reasons set forth above, that brief reference was technically incorrect. *Ash Grove*, 283 Mont. at 498, 943 P.2d at 92. The Court should have retained the statutory distinctions and used the "consistent with" standard throughout the discussion of that issue.[1]

¶74 Even with regard to zoning decisions, which the Court addresses under Issue 1B, we have recognized that the "substantial compliance" standard has probably been affected by recent legislation. *See Citizen Advocates for a Livable Missoula v. City Council*, 2006 MT 47, ¶¶ 20, 24-25, 331 Mont. 269, ¶¶ 20, 24-25, 130 P.3d 1259, ¶¶ 20, 24-25 ("[I]t may be assumed that the 2003 legislation was intended to reduce in some

---

[1]Further, in apparent support of its adoption of Neighbors' substantial compliance test, the Court quotes from the Growth Policy that "[a] finding should then be made as to the conformance of the identified policies to the issue." ¶ 23. Read in context, this suggestion in the Growth Policy for making findings is for the purpose of assessing the compliance of a new planning proposal (see reference to "site conditions" therein) with the Growth Policy, not assessing an amendment to the Growth Policy itself, or adoption of neighborhood plans, matters separately addressed in the Growth Policy under a section entitled "Continued Planning." That section makes no suggestions about making findings of fact or the standard by which to assess such Policy revisions.

fashion the reliance which local governing bodies are required to place upon growth policies when making land use decisions. However, although alluding to the passage of the new statute, both Appellants and Respondents have nonetheless framed their arguments regarding the validity of [Zoning] Ordinance 3234 under *Little's* 'substantial compliance' standard . . . ." Thus, the Court did not address the issue further.). In sum, under Issue 1A, a zoning issue is not presented and the substantial compliance standard is not applicable. Under Issue 1B, the Court fails to recognize that the standard has been adjusted by legislation, but I nonetheless concur with the Court's conclusion that the law was complied with. Under Issue 3, where the Court addresses the question of whether the Wolford Amendment conflicts with the Flathead County Growth Policy, the Court properly applies the "consistent" standard.

¶75   I turn to the merits under Issue 1A. The Court asks "[w]hether the Board developed a factual record sufficient to overcome Neighbors's claim that it abused its discretion by failing to support its decisions to amend the Growth Policy and the Zoning Regulations with independently adopted findings of fact." ¶ 19. In this issue, the Court considers the sufficiency of the record and reverses the District Court for essentially two reasons. First, it holds that the Board's "vague reference to having 'considered the information presented to it since the adoption of the resolution of intent'" was an inadequate consideration of the matters raised by the more than 4,400 written public comments. ¶ 34; *see also* ¶¶ 13, 35, 36, 37. Secondly, it concludes that the Board had "an obligation" to not only consider the public comments, but to "incorporate those comments into its decision-making process," ¶ 36, particularly those comments which

raised issues which the Court envisions as being "novel." ¶ 35; *see also* ¶ 71.  I disagree

with these conclusions, both factually and legally.

¶76    As an issue of fact, I disagree that the Board of County Commissioners

inadequately "considered" or "addressed" the over 4,400 public comments before making

its decision to adopt the Wolford Amendment to the Growth Policy.  According to the

minutes of the November 5, 2003, Board meeting:

> Commissioner Hall explained that before the Board for consideration today
> was a final resolution for a master plan amendment.  This was not an
> approval of the mall.  He expressed appreciation for the over 4,400
> passionate comments received from all over the area.  He summarized a
> disclaimer relative to the validity of all the signatures.  He noted that
> several of the letters encouraged a public vote of the plan change.
>
> Commissioner Gipe thanked Clerk Eggum for all of her work in reviewing
> the correspondence and preparing a calculation of the comments.  He
> displayed a clipping from the Daily Interlake of October 26[th] wherein the
> Columbia Falls and Kalispell Chamber of Commerce, Flathead Business
> and Industry Association, Evergreen Business and Property Owners
> Association, Kalispell Business Owners Association and Jobs Now all
> support the plan change along with over 600 individual names.  He
> speculated if you could get an accurate count it would probably end up
> about 50-50.  He noted that this change was also supported by the other
> elected officials from Flathead County.
>
> Commissioner Hall reviewed the resolutions:  One an approval of the plan
> change and another one putting the approval before a public vote.
> Chairman Watne and Commissioner Gipe stated they would not support
> putting the plan change on the ballot.  Commissioner Hall cited the over
> 4,000 comments providing a good feel of where the community stands
> relative to the issue.  He agreed putting the matter on the ballot at this time
> was not appropriate.

The resolution adopting the amendment also noted:

> **WHEREAS**, the Board of Commissioners has considered the information
> presented to it since the adoption of that resolution of intent.

33

Thus, the Commissioners had their staff review the public correspondence and prepare a calculation of the comments, noted that 600 individual names were listed in favor of the proposal as well as various organizations, cited the comments during the meeting, noted and rejected the suggestion made by some comments to put the matter on the ballot, described the public comments as "passionate" and expressed appreciation for the 4,400 comments received, noting that they came from all the surrounding area. In view of the statute, which, at most, requires "consideration of" public comments, *see* § 76-1-603, MCA, I believe the minutes, along with the final resolution, demonstrate that the Commissioners' actions completely satisfied the statutory obligation to "consider" public comment. Nothing more is required under the statute.

¶77 However, the Court imposes its own judicially-created requirements upon local governing bodies. The Court holds that the Commissioners are to engage in factfinding that will "incorporate [public] comments into its decision-making process," including a duty "to flesh out the pertinent facts upon which [it relied]," particularly those public comments which "raised novel issues," which the Court defines as those "not addressed by the Planning Office's report." In other words, the Court now imposes on the Board the obligation to evaluate each of the 4,400 comments to determine whether the comments were addressed in the planning report, and, if not, to make findings of fact about how the Commissioners disposed of each of these "novel" comments, whether favorably or not. Obviously, there is no way to know whether public comments have raised a "novel" issue unless each comment is individually scrutinized, recorded and compared. I submit that, not only do such obligations far exceed the "consideration"

34

required by statute, but are inconsistent with any practical understanding of the duties of local elected officials, particularly in rural counties which have little support staff. These officials are lay citizens elected to listen, not to document everything they have heard.[2]

¶78    In my opinion, these new requirements will foster micro-management of local governing bodies by the courts, a development inconsistent with the very nature of the decision we are reviewing—that is, as the Court acknowledges initially, "[a]mending a growth policy . . . constitutes a *legislative act*."  ¶ 18 (emphasis added).  Legislating should not require factfinding of the public opinion which influenced it.  This striking error is brought about by the authority erroneously relied upon by the Court.  Despite the express exclusion of local government units from MAPA, the Court nonetheless concludes that Neighbors's analogy to MAPA "proves apt to a degree," ¶ 28, and proceeds to impose MAPA-like requirements.  This case may well illustrate why the Legislature explicitly exempted local governments from MAPA's application.  Further, the Court relies on *Lowe* and *Schanz*, both of which were zoning cases, not growth policy cases, and were thus resolved by different statutes.  Lastly, the Court relies on *Annex Brooks, Inc. v. City of Indianapolis*, which was a constitutional challenge to a quasi-judicial act of denying an adult entertainment license to a particular business under a city ordinance which governed the license application process.  It was this *quasi-judicial* act which the federal court could not review without factfinding—not the city's legislative act in adopting the ordinance.  *Annex Brooks*, 333 F.Supp.2d at 782 ("the purpose of a

---

[2]Indeed, it would appear that any person making a public comment now has standing to challenge the commissioners' failure to properly consider the "novel" issue raised in their comment.

quasi-judicial proceeding by an agency, in this case, the Controller, is to flesh out the pertinent facts upon which a decision is based in order to facilitate judicial review"). I must agree that having additional factfinding would, no doubt, be helpful to the courts when reviewing these legislative decisions. However, convenience does not equate to a requirement. Having imposed formal requirements upon the exercise of legislative powers, this decision will have far-reaching and adverse ramifications for local governments.

¶79 Turning to Issue 3, I find the Court's decision to reach the issue of "[w]hether the Wolford Amendment is consistent with the Flathead Growth Policy" inherently contradictory with its decision to reverse and remand for more detailed consideration and findings of fact under Issue 1A. If, as the Court concludes under Issue 1A, the Board erred in not generating sufficient findings of fact to allow judicial review of the Amendment, how can we reach the issue of whether that Amendment is consistent with the Growth Policy and thereby satisfies the law? In doing the latter under Issue 3, the Court impliedly concedes that there really is sufficient evidence for purposes of Issue 1A. Of course, I agree with this conclusion, and therefore, concur with Issue 3, but dissent from the Court's reversal under Issue 1A.

¶80 I would affirm.

/S/ JIM RICE